**CONSOLIDATED GOLD FIELDS, PLC,** Newmont Mining Corporation, Newmont Gold Company, and Gold Fields Mining Corporation, Plaintiffs,

v.

**ANGLO AMERICAN CORPORATION OF SOUTH AFRICA LIMITED,** De Beers Consolidated Mines Limited, and Minorco S.A., Defendants.

No. 88 Civ. 7191 (MBM).

United States District Court, S.D. New York.

Oct. 24, 1988.

---

Lewis A. Kaplan (Jay Greenfield, Sidney S. Rosdeitcher, Lewis R. Clayton, Doreen Le Pichon, Kenneth Harmon, Jeh C. Johnson, Bruce Handler, Steven Fasman, Barbara L. Carter, Elizabeth Holland, Alexander Vasilescu, Victoria Ortiz and Daniel G. Cort, on the briefs), Paul, Weiss, Rifkind, Wharton & Garrison, Sidney Stein (Daniel Rothstein and Roanne L. Mann, on the briefs), Stein, Zauderer, Ellenhorn, Frischer & Sharp, New York City, for plaintiffs Consol. Gold Fields, PLC and Gold Fields Mining Corp.

Richard J. Holwell (Ronald W. Davis, on the briefs), White & Case, New York City, for plaintiffs Newmont Mining Corp. and Newmont Gold Co.

Jeremy G. Epstein (Kenneth M. Kramer, Rachel E. Deming, Kenneth A. Freeling, Edward Han, Alan Goudiss, James A. Rolfes, Idelle R. Abrams, Jennifer Bard and Karen Hart on the brief), Shearman & Sterling, New York City, for defendant Minorco, S.A. .

## SECOND AMENDED OPINION AND ORDER

MUKASEY, District Judge.

Plaintiffs Consolidated Gold Fields PLC (Gold Fields), its wholly owned subsidiary Gold Fields Mining Corporation (Gold Fields Mining), Newmont Mining Corporation (Newmont) and its 90% subsidiary, Newmont Gold Company (Newmont Gold),

move to enjoin preliminarily defendants Anglo American Corporation of South Africa Limited (Anglo), De Beers Consolidated Mines Limited (De Beers), and Minorco, S.A. (Minorco) from proceeding with a hostile tender offer for all of Gold Fields' stock. Plaintiffs allege that defendants' proposed acquisition violates §§ 10(b) and 14(e) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), 78n(e) (1982) and S.E.C. Rule 10b–5, 17 C.F.R. § 240.10b–5 (1988), promulgated thereunder, § 7 of the Clayton Act, 15 U.S.C. § 18 (1982), and §§ 1 and 2 of the Sherman Antitrust Act 15 U.S.C. §§ 1, 2 (1982), and they therefore seek their injunction pursuant to 15 U.S.C. § 78aa (1982) for the securities claims, and § 26 for the antitrust claims. For the reasons discussed below, plaintiffs' prayer for relief is denied under the securities laws for lack of subject matter jurisdiction, and is granted under the antitrust laws.

## I.

Gold Fields is a British corporation with half of its assets in the United States, and 2.5% of its owners here. (10/21/88 Tr. p. 7). Sixty percent of these American owners own their shares through trustees, and 40% own their shares through banks, who issue American Depository Receipts (ADR's) traded over the counter in the United States. (10/21/88 Tr. p. 7). An ADR allows the ownership and voting interest in a foreign corporation's securities to be traded here, even though those securities are not registered here. *See* 17 C.F.R. §§ 229, 230, 239.13 (1988). However, in order to remain exempt from registration in the United States, the foreign corporation itself or the government that incorporated it must make filings with the SEC pursuant to SEC Rule 12g3–2.

Gold Fields owns a 48% stake in Renison Gold Fields Consolidated Limited (Renison) an Australian gold miner, and a 38% stake (and a 48% voting interest) in Gold Fields of South Africa Limited, the second largest gold miner in South Africa. (First Kaplan Dec. Exh. 2; Exh. 3, p. 310). In addition, Gold Fields wholly owns Gold Fields Mining Corporation, a Delaware corporation with headquarters in New York and gold mines in California and Nevada. However, the crown jewel in Gold Fields' assets is its 49.3% stake in plaintiff Newmont Mining Corporation (Newmont). (First Kaplan Dec. Exh. 1, p. 6). Newmont is a Delaware corporation headquartered in New York. Newmont, in turn, owns 90% of plaintiff Newmont Gold Company (Newmont Gold), a Delaware corporation with headquarters in New York, the largest gold producer in the United States. Newmont also owns 75% of Newmont Australia, Ltd., an Australian gold miner. (Parker Dec. ¶¶ 5, 10, 12).

Gold Fields and its various associated companies are the second-largest gold producer in the free world, mining 12% of the non-communist world's production. (Du Boulay Dec. ¶ 5). Gold Fields' gold mining operations are generally more efficient than South African mines, and its market share is expected to increase over the next few years because of its expansion plans. (Stewart Affidavit ¶¶ 11–14; Du Boulay Dec. at ¶ 6).

Defendant Minorco is a Luxembourg societe anonyme. Over a third of Minorco's holdings are in the United States, and include a 56.2% equity interest (and 43% voting interest) in Inspiration Resources Corporation, a 48.3% effective equity interest in Adobe Resources Corporation, a 80.6% share of Danville Resources, Inc. and a 30.3% share of Engelhard Corporation, a metals refiner. (First Kaplan Dec. Exh. 9, pp. 5–7, 13; Exh. 10, pp. 3–5, 10; Exh. 11, p. 16).

Minorco shares are traded in England, and Minorco ADRs are traded over the counter in the United States. (First Kaplan Dec. Exh. 10 p. 27). However, Minorco claims that it does not facilitate the trading of these ADRs, and there is no assertion that Minorco itself trades them. (Fisher Dec. at ¶¶ 3, 8).

Neither is there any allegation that Minorco operates any of the United States companies in which it has a stake. (Fisher Dec. at ¶ 4). Minorco has no employees in the United States, does not own or lease real property in the United States, has no

bank accounts, post office boxes or telephone listings here, does not solicit and never has solicited business here, has never sued here, and has never applied for a license to do business here. (Fisher Dec. at ¶¶ 4–6).

Anglo is a South African company, with headquarters there and offices in England. (First Kaplan Dec. Exh. 4, p. 1). Anglo and its subsidiaries own or substantially control mines which collectively produce the most gold in the free world. (Du Boulay Dec. ¶ 4). E. Oppenheimer & Sons Limited, a company allegedly controlled by Oppenheimer, owns 8.2% of Anglo outright. (First Kaplan Dec. Exh. 3, pp. 40–41, 299–300).

De Beers is also a South African company with headquarters there and offices in England. (First Kaplan Dec. Exh. 6, p. 1). De Beers mines and markets diamonds, advertising its wares in the United States using the slogan "a diamond is forever." (First Kaplan Dec. Exh. 6, pp. 48–50). De Beers and its affiliates have been sued for monopolizing the diamond market, and have concluded those suits through consent decrees prohibiting De Beers and its affiliates from price fixing, market allocation, or bid rigging in the diamond grit market. *United States v. De Beers Indus. Diamond Div. (Ir.) Ltd.*, 1978–1 Trade Cas. (CCH) ¶ 62,056 (S.D.N.Y.1976); *United States v. De Beers Indus. Diamond Div. Ltd.*, 1976–1 Trade Cas. (CCH) ¶ 60,825 (S.D.N.Y.1976). In addition, De Beers is a participant in the Central Selling Organization, an organization that maintains price stability in the diamond market. (First Kaplan Dec. Exh. 6, p. 50).

Plaintiffs allege that through a complex web of corporations and associations, Anglo and De Beers are controlled by Harry Oppenheimer. In that regard, plaintiffs assert Minorco is 39.1% owned by Anglo and 21% owned by De Beers. (First Kaplan Dec. Exh. 9, p. 17). In addition, Harry Oppenheimer has an "indirect partial" 7% interest in Minorco's shares. (Ogilvie Thompson Dec. ¶ 5). Moreover, four of Minorco's directors reside in the United States, and three of them sit on the Anglo board, and two of those three sit on the De Beers board. (First Kaplan Dec. Exh. 9, p. 4). Gavin Relly, a Minorco director, is chairman of Anglo, and Oppenheimer family members hold three seats on Anglo's board of directors. If looked at in total, Minorco and Anglo have five directors in common, and Minorco and De Beers have six. Nevertheless, Minorco asserts that Oppenheimer does not control Minorco through Anglo and De Beers. (Edwardes Dec. ¶ 4; Ogilvie Thompson Dec. at ¶ 16). However, plaintiff concludes that Oppenheimer controls inefficient gold mining facilities that in 1987 produced approximately 270 tons, or 20% of the 1,373 tons mined that year. (Du Boulay Dec. Exh. A; Stewart Dec. at ¶¶ 11–14).

On February 12, 1980, between 9:15 and 9:55 a.m. London time, De Beers and Anglo bought 29.4% of the stock of Gold Fields in open market transactions. (First Kaplan Dec. Exh. 15, p. 14). In April 1981, representatives of Minorco, De Beers and Anglo met in New York to discuss purchasing a large share of Newmont, and draft agreements were drawn up and discussed in New York. (Leather Dec. ¶¶ 3–5, and Exhs. A and B). These discussions eventually broke down. (Leather Dec. at ¶ 6).

On November 1, 1983, Gold Fields agreed not to buy over approximately 49.9% of Newmont's stock in exchange for a certain measure of control over Newmont's fundamental business planning. (Second Kaplan Dec. Exh. 12, §§ 6, 8). Called a standstill agreement, for obvious reasons, the agreement binds only Gold Fields and its subsidiaries. *Id.* at § 1. It does not bind Minorco now, nor would it bind Minorco if Minorco were to succeed in this tender offer. *Id.* at §§ 2a and 1.

In late 1986 and early 1987, Minorco and Gold Fields again discussed merging, but again the talks collapsed. (Ogilvie Thompson Dec. at ¶¶ 19–24). On September 21, 1988, Minorco announced its intention to commence the tender offer for the rest of the Gold Fields stock. (First Kaplan Dec. Exh. 16 (press report)). On October 4, 1988, the tender offer began. In preparing for the present tender offer, Minorco hired

the law firm of Shearman & Sterling. Shearman & Sterling, apparently believing that United States law applied to the tender offer, wrote a letter to Newmont on September 21, 1988 which says in part "The Hart–Scott–Rodino ... Act 15 U.S.C. § 18a [1982] requires that you be advised of the following in connection with Minorco's Secondary Acquisition of Newmont's shares...." (Parker Dec. Exh. A). *See* 16 C.F.R. §§ 803.5(a), 801.30(a)(4), 804.4 (1988). Minorco explains the hiring of Shearman & Sterling by asserting that the firm is "providing legal services to Minorco in connection with the Offer...." First Kaplan Dec. Exh. 9 at 18. In addition, Minorco has turned to Chemical Bank, in New York, to help arrange financing for the deal. (First Kaplan Dec. Exh. 11, p. 35). Minorco has also hired Kelst & Co., Inc., a New York public relations firm. (Perella Dec. ¶¶ 2–4). Finally, Minorco's lobbyist in Washington has recently renewed its registration. (Second Kaplan Dec. Exh. 23).

When it announced the tender offer, Minorco did not invite reporters from the United States to its press conferences, did not return their phone calls, and did not distribute press releases to them. (Richmond–Watson Dec. ¶¶ 7–11). Minorco mailed the tender offer document to every shareholder of record, but did not mail the document to Gold Fields ADR holders or beneficial owners in the United States. *Id.* Instead, Minorco merely directed the banks issuing ADR's that they were to inform American ADR holders of an upcoming shareholder's meeting to increase the number of authorized shares. *Id.* However, it seems clear that Minorco knew that trustees and ADR depositories holding the Gold Fields shares were obligated by law to forward the tender offer document to beneficiaries and ADR holders in the United States. (Dunning Dec. ¶ 9; Olsen Dec. ¶ 5; Avidon Dec. ¶ 6; Pryor Dec. ¶¶ 12–13). Nevertheless, ADR holders in the United States who inquired were told by Minorco that the offer was not open to them, if they were not completely ignored. The tender offer requires that Gold Fields ADR holders and other beneficial owners of Gold Fields shares direct their trustees to tender their shares offshore. As a result of the tender offer, the price of Gold Fields ADR's has jumped dramatically. (Rosen Dec. ¶ 10; Pryor Dec. at ¶¶ 6–8).

Moreover, Minorco's President Henry Slack called Newmont's chairman at 3:00 a.m. in New Cannan, Connecticut, to announce the tender offer. (Parker Dec. at ¶ 4). The next day, Slack sent a "fax" to Newmont's chairman in New York, apologizing for the late call, and offering to meet him in New York. (Parker Dec. at ¶ 8, Exh. B). On September 23, 1988, Felix Rohatyn, partner of Lazard Freres, New York, and former Minorco director contacted Newmont's chief financial officer to arrange a meeting with Minorco's chairman. (First Kaplan Dec., Exh. 10, p. 38; Fontaine Affidavit ¶¶ 3–4). A few days later, Newmont's chairman received a telephone call from a partner at Lazard Freres, New York, informing him that Rohatyn wished to meet with him in New York. (Parker Dec. at ¶¶ 3, 6, 9; Perella Dec. at ¶¶ 2–4).

Plaintiffs allege that the tender offer violates the securities laws because certain material facts about the offerors are not revealed. For example, they assert that the offerors do not reveal that they are controlled by a South African dynasty run by Harry Oppenheimer. (*Compare* Plaintiffs' Memorandum at 30, 38 *and* Agnew Dec. ¶¶ 3–9 *with* First Kaplan Dec. Exh. 11, p. 9).

Plaintiffs also assert that the tender offer will violate the antitrust laws because it will give the Oppenheimer group control over 32% of the non-communist world's mine production of gold. Plaintiffs allege that upon completion of the merger, Gold Fields Mining Corporation's mines in California and Nevada will be shut down to make Oppenheimer's less efficient South African mines more competitive. (Stewart Aff. at ¶¶ 11–14; First Kaplan Dec. Exh. 25, pp. 24–27).

In addition, plaintiffs assert that they will be placed at a commercial disadvantage if they are forced to identify themselves as a South African company. (Agnew Dec. at ¶¶ 12–13; Parker Dec. at

¶¶ 12–13, and First Kaplan Dec. Exh. 28, p. 2). For example, plaintiffs claim that Papua New Guinea will require the divestiture of Renison if its parent Gold Fields is acquired by Minorco. (First Kaplan Dec. Exh. 26 (Press Statement by the Prime Minister, Papua New Guinea, Oct. 10, 1988).) Finally, plaintiffs assert that they will become the targets of antitrust suits if the tender offer succeeds, further harming them.

Minorco has stated that if the tender offer were successful, it would sell Gold Fields' interests in Newmont and Gold Fields South Africa, thereby denuding Gold Fields of the majority of its gold mining assets. (Edwardes Dec. ¶¶ 10–14, Exhibit A). Plaintiffs assert, however, that if that were to happen, defendants Anglo and De Beers who now control the second largest block of stock in Gold Fields South Africa could become the holders of the largest block. (First Kaplan Dec. Exh. 4, p. 52, Exh. 6, p. 11, Exh. 3 p. 308). Plaintiffs conclude that such control would allay neither their antitrust nor their divestiture concerns.

## II.

A preliminary injunction may be granted only if plaintiffs prove: (a) irreparable harm, and (b) either (1) likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Savage v. Gorski,* 850 F.2d 64, 67 (2d Cir.1988); *Jackson Dairy v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979).

Minorco argues first that this Court may not exercise personal jurisdiction over it without offending "traditional notions of fair play and substantial justice" engaged by the due process clause. *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).[1] "Where a challenge to jurisdiction is interposed on an application for a preliminary

injunction '[t]he plaintiff is required to establish that there is at least a reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits.'" *Visual Sciences v. Integrated Communications,* 660 F.2d 56, 59 (2d Cir.1981), *quoting Industrial Elecs Corp. v. Cline,* 330 F.2d 480, 482 (3d Cir. 1964).

■ The issue here is whether Minorco has sufficient "contacts, ties or relations" with the forum to justify the assertion of personal jurisdiction. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 299, 100 S.Ct. 559, 568, 62 L.Ed.2d 490 (1980). The plaintiffs' claims in this case are based on the federal securities and antitrust laws, as opposed to state law. Accordingly, the inquiry is whether Minorco has sufficient contacts with the United States rather than with any one state. *Mariash v. Morrill,* 496 F.2d 1138, 1143 (2d Cir.1974).

When a plaintiff's claim against a defendant "is related to or 'arises out of' a defendant's contacts with the forum, ... a 'relationship among the defendant, the forum, and the litigation' is the essential foundation of *in personam* jurisdiction." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984), *quoting Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977). By contrast, when the litigation does not relate to or arise out of such contacts, then that defendant's contacts with the forum must constitute "continuous and systematic general business contacts" in order for a court to assert jurisdiction consistent with due process *Helicopteros,* 466 U.S. at 416, 104 S.Ct. at 1873. *See also, Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 438, 445, 72 S.Ct. 413, 418, 96 L.Ed. 485 (1952). In such a case the forum asserts "general jurisdiction" over a defendant. *Helicopteros,* 466 U.S. at 414, 104 S.Ct. at 1872.

---

**1.** Unlike *International Shoe,* the clause at issue in a case such as this involving federal question jurisdiction is the one contained in the Fifth rather than in the Fourteenth Amendment. *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326, 1340 (2d Cir.1972).

Apart from simple fairness to a defendant judged by its contacts with the forum, another factor that may properly be considered in a due process analysis is the forum's interest in providing a remedy in its courts to prevent or redress harm to its citizens. *Retail Software Servs., Inc. v. Lashlee,* 854 F.2d 18, 24 (2d Cir.1988).

Minorco argues both that it maintains no contact with the United States sufficient to justify general jurisdiction over it, and that it has done nothing in the United States sufficiently related to the plaintiffs' claims to justify asserting jurisdiction over it in respect of those claims. I agree with the first argument, but not with the second.

■ Minorco's contacts with the United States are insufficient to justify general jurisdiction over it. Minorco has never had an office nor has it ever owned or leased real property in the United States or had a post office box or telephone listing here. It is not licensed to do business anywhere in the United States, nor does it own the majority of stock in or otherwise control any entity headquartered or registered in the United States or otherwise doing business in this country. (Fisher Dec. ¶¶ 5–7). Plaintiffs point to Minorco's substantial holdings in four of this country's natural resources companies, which Minorco has valued at more than $650 million and which constitute more than 20% of its investment portfolio (First Kaplan Dec. Exh. 11 (*Minorco Tender Offer Document*) p. 2) and which plaintiffs describe variously as "very substantial," "impressive" and "awesome," and to the fact that Minorco is in the investment business. Notably, plaintiffs have not suggested that any of the companies in which Minorco holds stock is run as a mere department of Minorco, or is anything but an independent entity. Substantial stock ownership, even majority ownership by an investment company, has been considered before by this court as a basis for asserting general jurisdiction over a defendant, and found wanting. *Huang v. Sentinel Government Secs.,* 657 F.Supp. 485, 489–90 (S.D.N.Y.1987). *See also, Morse Typewriter Co. v. Samanda Office Communications, Ltd.,* 629 F.Supp. 1150,

1152–54 (S.D.N.Y.1986) (Weinfeld, J.) (New York long-arm statute). I find it wanting here as well.

Plaintiffs add that although Minorco's stock is not registered on any exchange in this country, its securities are traded here in the form of ADR's, and assert that this trading, when added to Minorco's holdings of American securities, is sufficient to warrant the exercise of general jurisdiction. Yet there is no evidence that this trading is the result of any act by Minorco itself. Plaintiffs' counsel brandished at oral argument an SEC list of companies whose ADR's are traded on securities exchanges in this country, including a footnoted description of those issuers on the list as having "both claimed the exemption and ... submitted relatively current information to the Commission." (10/21/88 Tr. 37). Yet the relevant regulations, as noted above, do not require the issuer itself to sponsor the trading in its ADR's, and to make the necessary filings. Nor does the list in question purport to distinguish between those issuers that have sponsored the filings and those that have not. In the face of an explicit averment on behalf of Minorco that its ADR's are unsponsored, the SEC list is no proof to the contrary.

In sum, even if I were to endorse all of the adjectives proposed by plaintiffs to describe Minorco's holdings, and add in the trading in this country of unsponsored Minorco ADR's, those holdings and that trading still do not amount to "continuous and systematic general business contacts," *Helicopteros,* 466 U.S. at 416, 104 S.Ct. at 1873, sufficient to warrant the exercise of general jurisdiction.

■ When the issue narrows to whether any of plaintiffs' claims arises from or is related to any of Minorco's contacts with the forum, the result is different. First, it is not disputed that Minorco has been courting Newmont intermittently over more than seven years, and that their courtship has included meetings in New York at the offices of Shearman and Sterling and a Hart–Scott–Rodino filing in September 1981. Minorco's listed financial advisers at the time included Felix Rohatyn

and George Ames of Lazard Freres & Co. There was also at least one meeting in New York in January 1987 and apparently another in early 1988. (Leather Dec. 10/20/88 ¶¶ 3, 7, 8 and Exhibit C, p. 3; Parker Dec. 10/20/88) Although no merger resulted from these meetings, and they are not themselves part of the tender offer directly at issue in this case, they do provide an insight into Minorco's intent and focus when the tender offer was made. No party disputes that Minorco has retained Lazard Freres & Co. as its financial adviser in connection with this tender offer. Although Minorco insists that this retention occurred in London, it is undisputed that after the tender offer was made, Henry R. Slack, president and a director of Minorco, called Gordon R. Parker, chairman of Newmont, to try to arrange a meeting with him in New York that was to have included Rohatyn. Some days later, George Ames of Lazard tried to arrange a meeting with Parker in New York to be attended by him and by Rohatyn that was certainly part of the tender offer. (Parker Dec. 10/10/88). I find from the available documents and affidavits that Minorco's contacts were expressly designed to achieve Newmont's consent, or a least neutrality to the takeover. Although these meetings did not occur, the calls do make it plain that the retention of Lazard Freres & Co., wherever it took place, specifically included the services in New York of Messrs. Ames and Rohatyn, who had been advising Minorco since 1981.

Additionally, in connection with the tender offer at issue here, and presumably for the purpose of permitting the acquisition of Gold Fields and of a major interest in Newmont to go forward lawfully, Shearman & Sterling, acting in New York as counsel to Newmont, sent a Hart–Scott–Rodino notice to Parker on September 21, 1988. (Parker Dec. 10/10/88, Exhibit A)

Finally, no party disputes that the tender offer documents disclose that Chemical Bank of New York has provided financing for the proposed transaction.

From these acts and based on the record before me I find that Minorco has for some time focused its attention substantially on Newmont in the United States in an effort to gain an interest in Newmont, that it has retained the services of financial advisers and lawyers in the United States in aid of that effort, that it has obtained financing in the United States as part of that effort, and that it has sought to further that effort by making filings in the United States required under this country's laws. Minorco has pursued this course of conduct, aimed at and including steps taken in the United States, to further an acquisition that will have, as set forth below, substantial anti-competitive effects in the United States, a result this country has a substantial interest in preventing or redressing. *Retail Software*, 854 F.2d at 24. Therefore, I cannot see how Minorco can seriously claim that "traditional notions of fair play and substantial justice," *International Shoe*, 326 U.S. at 316, 66 S.Ct. at 158, would be offended by requiring Minorco to defend a lawsuit in the United States.

Minorco has detailed the many steps it took to avoid contact with the United States. These included labeling its initial press release "Not for distribution in the USA" (Richmond–Watson Dec. ¶ 5); refusing to answer telephone calls from American reporters and excluding them from the list of those invited to press conferences dealing with the offer (*Id.* at ¶ 7); refraining from any direct communication with any Gold Fields shareholder or ADR holder in the United States (*Id.* at ¶¶ 8–9); and providing elaborate disclaimers in its offering documents of any intent to include ADR's in the offer or to use United States mails or securities exchanges to distribute the offer. (*Id.* at ¶ 11)

By taking such steps, Minorco apparently contends, it was structuring its conduct so as to avoid exposure to suit in the United States. After all, the due process clause requires that individuals have " 'fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign.' " *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985), *quoting Shaffer v. Heitner,* 433 U.S. 186, 218, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683 (1977) (Stevens, J.,

concurring in judgment). It thereby "'gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.'" *Id. quoting World–Wide Volkswagen Corp.*, 444 U.S. at 297, 100 S.Ct. at 567. The fair warning requirement is satisfied, however, "if the [out-of-forum] defendant has 'purposefully directed' his activities at residents of the forum," *Id. quoting Keeton v. Hustler Magazine*, 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed. 2d 790 (1984), "and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Id. quoting Helicopteros*, 466 U.S. at 414, 104 S.Ct. at 1872. In this case, where Minorco's "intentional and allegedly ... [unlawful], actions were expressly aimed at" the United States, *Calder v. Jones*, 465 U.S. 783, 789, 104 S.Ct. 1482, 1487, 79 L.Ed.2d 804 (1984), and the company knew and intended that its actions would have a direct impact on Newmont with whatever consequences that impact might have for competition in the United States, Minorco "must 'reasonably anticipate being haled into court there' to answer for" its actions. *Id. quoting World–Wide Volkswagen Corp.*, 444 U.S. at 297, 100 S.Ct. at 567.

### III.

■ Before a court may proceed to adjudicate a dispute, it must find not only that it has personal jurisdiction over the parties, including particularly in this case the unwilling defendants, but also that it has subject matter jurisdiction, construing the available evidence in the light most favorable to plaintiffs. *AVC Nederland v. Atrium Inv. Partnership*, 740 F.2d 148, 149 (2d Cir.1984). In this case, with respect to plaintiffs' securities fraud claim, the court must find "a sufficiently serious effect upon United States commerce to warrant assertion of jurisdiction for the protection of American investors...." *Schoenbaum v. Firstbrook*, 405 F.2d 200, 209 (2d Cir.)

*partially rev'd on other grounds*, 405 F.2d 215 (1968) (*en banc*), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969).

Here the contention is that various alleged misstatements in the tender offer document will mislead American investors in Gold Fields who, to the extent they own any interest in Gold Fields do so through ADR's.[2] As noted above, although the holders of these ADR's were not targeted as part of the tender offer, it is apparent that some proportion of them were reached with the knowledge of Minorco. With respect to the misstatements themselves, it is not alleged that any resulted from conduct in the United States.

■ In considering whether to apply the federal securities laws to international transactions, the Second Circuit has fashioned two tests: the "effects" test announced in *Schoenbaum* and the "conduct" test. *Psimenos v. E.F. Hutton & Co., Inc.*, 722 F.2d 1041, 1045 (2d Cir.1983). "The conduct test does not center its inquiry on whether domestic investors or markets are affected, but on the nature of conduct within the United States as it relates to carrying out the alleged fraudulent scheme...." *Id.* Here there is simply no conduct alleged by Minorco that is anything but incidental to the alleged fraud, assuming *arguendo* that there was fraud. Although Minorco's contacts here suffice for personal jurisdiction, there are no allegations that fraudulent statements were made in the course of those contacts. Such conduct is thus insufficient to warrant a finding of subject matter jurisdiction. *Fidenas AG v. Compagnie Internationale*, 606 F.2d 5, 10 (2d Cir.1979); *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 31 (D.C.Cir.1987).

As to the "effects" test, the maximum percentage of Gold Fields securities holders who are U.S. residents is 2.5%. Of these, some indeterminate number apparently received the allegedly misleading offering documents only because Minorco

---

**2.** Plaintiffs' counsel conceded at oral argument that the number of Gold Fields shares owned directly by U.S. residents is insignificant.

had to provide such documents to the depositaries. Here it is relevant to consider that Minorco did in fact take whatever steps it could to assure that the tender offer documents would not reach Gold Fields ADR holders. *Plessey Co. PLC v. General Elec. Co. PLC*, 628 F.Supp. 477, 494–95 (D.Del.1986) (1.6% of the relevant shares held in the United States insufficient such that "exercise of federal court jurisdiction appears ill advised"). In these circumstances, the attenuated and potential effect of the alleged fraud in connection with a securities transaction between two foreign corporations is not within the formulation in *Schoenbaum*.

Rather, the facts here suggest the same conclusion Judge Friendly reached in *ITT v. Vencap, Ltd.*, 519 F.2d 1001, 1017 (2d Cir. 1975) when he wrote: "We cannot believe that Congress would have intended the anti-fraud provisions of the securities laws to apply if [an American citizen], in London, had defrauded a British investment trust by selling foreign securities to it simply because half of one per cent of its assets was held by Americans." Similarly, the mere fact that an insignificant number of Americans hold stock in the defrauded London company is not enough to support subject matter jurisdiction.

For the above reasons, this Court lacks subject matter jurisdiction over plaintiffs' securities law claims.

### IV.

■ Plaintiffs claim that the proposed merger would substantially lessen competition in the international gold market, thus violating Section 7 [3] of the Clayton Act and Sections 1 [4] and 2 [5] of the Sherman Act. Because the merger directly impacts on American markets, this court has subject-matter jurisdiction to hear this claim. *National Bank of Can. v. Interbank Card Assn.*, 666 F.2d 6, 8 (2d Cir.1981); *Transnor v. BP North Am.*, 666 F.Supp. 581 (S.D.N.Y.1987).

■ Subject-matter jurisdiction, however, does not end the threshold inquiry. Plaintiffs also must have standing to assert antitrust claims. The vehicle for seeking injunctive relief is Section 16 of the Clayton Act which provides in pertinent part:

> [a]ny ... corporation ... shall be entitled to sue for and have injunctive relief in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws ...

15 U.S.C. § 26 (1982). In order to maintain an action under § 16, plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent. *Cargill v. Monfort of Colo.*, 479 U.S. 104, 122, 107 S.Ct. 484, 495, 93 L.Ed.2d 427 (1986). *Cargill* thus applied a standing requirement similar to the test the Court had earlier enunciated for § 4 claims under the Clayton Act. *Brunswick Corp. v. Pueblo Bowl–O–Mat*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Plaintiffs argue that the Sherman Act claims do not require standing, but this contention is meritless. Inasmuch as only § 16 provides for injunctive relief for private parties, and thus the Sherman Act claims are predicated on § 16, that section's standing requirements control.

In support of their motion, plaintiffs have posited several forms of injury. First, they claim that all plaintiffs face the elimination of Gold Fields as an indepen-

---

**3.** Section 7 of the Clayton Act, 15 U.S.C. § 18 (1982), provides, in pertinent part: "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital ... of another corporation ... wherein any line of commerce in any section of the country the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

**4.** Section 1 of the Sherman Act, 15 U.S.C. § 1 (1982), prohibits every "combination ... or conspiracy, in restraint of trade of commerce among the several States, or with foreign nations...."

**5.** Section 2 of the Sherman Act, 15 U.S.C. § 2 (1982) provides, in pertinent part: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a felony ..."

dent competitor of Anglo. Second, they assert all plaintiffs will be vulnerable to being named as defendants in government or private antitrust actions brought against them as companies controlled by the Anglo. Third, they contend that Anglo's decisions will be driven by a desire to maximize profits for the Group as a whole, rather than to maximize profits for the mines presently controlled by plaintiffs.

Newmont also argues that, once the takeover of Gold Fields is complete, Anglo, through its 49% ownership of Newmont would attempt to shut down the company. As an owner of higher-cost South African gold mines, Anglo would have an economic incentive to curtail the expansion of the lower-cost non-South African mines now within the Gold Fields group. Although defendants will be in a position to control the Newmont mines, their beneficial interest in them will be substantially less than their interests in the mines they now control. They will thus have an incentive to enhance the profitability of their higher-cost South African mines at Newmont's expense. A similar argument is made on behalf of plaintiff Gold Fields Mining, a wholly-owned subsidiary of Gold Fields, which operates mines in the United States. Gold Fields also owns 48% of Renison and 38% of Gold Fields South Africa Ltd., but neither of those companies is a party to this action. Gold Fields, however, claims injury derived from the threatened shutdown of those companies' holdings in Australia, Papua New Guinea, and South Africa.

Further, Newmont contends that competition will be hurt in the gold market after the takeover. Newmont asserts that Minorco is controlled by Anglo and De Beers and, through other corporations, by Harry Oppenheimer, and that together the Anglo group is the largest producer of gold in the non-communist world, producing 20% of the gold mined in 1987. Because Gold Fields, directly or through its subsidiaries and associates, accounts for 12% of the market, Newmont claims, the proposed takeover of Gold Fields would give Anglo control of 32% of the market, significantly decreasing competition in the market. Gold Fields

joins in this argument, claiming derivative injury from the impact this would have on its Australian and Papua New Guinea subsidiaries.

Finally, Gold Fields claims injury because the Papua New Guinea government, because of its moral opposition to the South African government's apartheid policies, will require Anglo, which is largely a South African concern, to sell Renison's operations there.

■ Both parties vigorously dispute whether targets have standing to assert antitrust injury under § 16. Defendants note growing legal precedent holding that targets *per se* lack standing to seek relief under the antitrust laws. *A.D.M. Corp. v. Sigma Instruments*, 628 F.2d 753, 754 (1st Cir.1980) ("the interests of the target corporation itself .. are outside of [Clayton Act] section seven's protection"); *Burlington Indus. v. Edelman*, 666 F.Supp. 799 (M.D.N.C.1987); *Carter Hawley Hale Stores v. Limited*, 587 F.Supp. 246, 250 (C.D.Cal.1984). Commentators have also questioned standing for targets. *See*, F.H. Easterbrook & D.R. Fischel, *Antitrust Suits by Targets of Tender Offers*, 80 Mich.L.Rev. 1155–56 (1982); 2 P. Areeda & D.F. Turner, *Antitrust Law*, ¶ 346b (1978) ("These suits are usually an automatic strategy to resist a takeover for reasons wholly unrelated to antitrust interests and antitrust interests are rarely involved").

■ In *Grumman Corp. v. LTV Corp.*, 665 F.2d 10, 11 (2d Cir.1981), however, the Second Circuit expressly declined to adopt such a *per se* rule. That precedent binds this court. *Arnett v. Gerber Scientific*, 566 F.Supp. 1270, 1274 (S.D.N.Y.1983). Nevertheless, *Grumman* does not end the inquiry because, even if there is no *per se* rule denying standing to target companies, the more recent Supreme Court decision in *Cargill* requires that plaintiffs also demonstrate antitrust injury. In this regard, dictum in *Grumman*, 665 F.2d at 16, that a target company is "entitled under § 16 to preserve its separate existence as a competitor" has been undercut by *Cargill's* requirement that plaintiffs not just show

*any* form of injury, but specifically an injury which the antitrust laws were designed to prevent. It is axiomatic that Congress enacted the Sherman Act to protect competition, not competitors, *Int'l Distrib. Ctrs. v. Walsh Trucking,* 812 F.2d 786, 793 (2d Cir.1987), and thus that the mere threat to continued existence of a corporation, without more, fails to satisfy the standing requirement. Moreover, as the footnote related to the comment in *Grumman* implicitly indicates, 665 F.2d at 16 n. 4, the panel there was applying the view, rejected in *Cargill,* that *Brunswick's* requirement of antitrust injury does not extend to § 16 claims. Therefore, plaintiffs cannot simply rest on their claim that they will cease to exist as competitors, but must show how this takeover will suppress competition *and* thus hurt them.

 Accordingly, I turn to plaintiffs' claims of injury. At the outset, plaintiffs' assertion that they will be forced to defend against antitrust lawsuits, while a novel claim, is certainly not the type of harm the antitrust laws were designed to redress. Second, there is no legal substance in the argument that Gold Fields will suffer antitrust injury from the fact that its partially owned subsidiary, Renison, will be required by the Papua New Guinea government to sell its mines there. Such injury results from a government's moral revulsion to apartheid; it is not *antitrust* injury. *Cf. Central National Bank v. Rainbolt,* 720 F.2d 1183, 1187 (10th Cir.1983) (injuries alleged by target bank and its chairman were "not a result of any diminution in competition but rather the effect of a change in bank control").

 Gold Fields' and Gold Fields Mining Corp.'s claim of direct harm are also without merit. It defies logic to assume that a company completely owned by another will face injury from that company's added market power: if anything, Gold Fields and its wholly-owned subsidiary will reap enormous benefits. *See Carter Hawley Hale Stores,* 587 F.Supp. at 250 ("If the proposed merger is completed, [the target] will be a part of the very entity it claims will have a supercompetitive advantage,

*i.e.,* it suffers no antitrust harm"). Similarly, Gold Fields' argument that it will be harmed *derivatively* by the anti-competitive injury the new Anglo will inflict on companies it partly owns but which will remain independent after the takeover (Newmont, Renison, and Gold Fields South Africa) is also counter-intuitive. Gold Fields will no longer be around to suffer the consequences of Anglo's anticompetitive practices. Rather, Anglo will take over Gold Field's entire interest in these investments.

 However, two of those companies, Newmont and its largely-owned subsidiary, Newmont Gold, are plaintiffs in this action. They argue that they face two kinds of anticompetitive harm if the takeover is allowed to proceed. Specifically, they argue that Anglo will hold Newmont's head under water because Anglo will have added incentive to reap greater profits from mines it wholly owns outright in South Africa, while suffering comparatively less harm by reducing output in companies it owns only in part, such as Newmont. This incentive derives from the fact that a reduction in non-South African mines' output will lead to higher gold prices and greater profits for defendants.

Additionally, Newmont argues that it will suffer injury because the creation of a new Anglo commanding nearly a third of the world's production in gold will significantly lessen Newmont's ability to compete successfully in the market. These claims assert antitrust injury within the meaning of *Cargill* sufficient to accord Newmont and Newmont Gold standing here to assert antitrust claims. *Cf. Chrysler Corp. v. G.M.,* 589 F.Supp. 1182 (D.D.C.1984) (Chrysler has standing to question joint venture between GM and Toyota, two competitors). Accordingly, I now proceed to the merits of these claims, mindful that plaintiffs retain the burden of persuasion at all times.

Although Newmont's argument is twofold, it forms a unitary whole. Essentially, Newmont claims that Anglo's takeover of Gold Fields will give it a commanding 32% share of the noncommunist world market

in gold and thus monopoly power over pricing. This will lessen competition in the market and hurt Newmont. But Newmont will face a far greater risk because it will be 49% controlled by Anglo. Thus, Anglo will be able to reduce Newmont's output, shoring up its dominance of the world market and, not incidentally, the world price for gold. Anglo's incentive to accomplish this squeeze on Newmont is heightened by the very fact that it owns comparatively less of Newmont than it does of its South African holdings. The result will be not only a generalized deleterious effect on the market affecting Newmont, but also a direct assault on its ability to compete effectively.

In interpreting § 7 of the Clayton Act, the Supreme Court has ruled "that a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *United States v. Philadelphia Nat'l. Bank*, 374 U.S. 321, 363, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1963); *United States v. General Dynamics Corp.*, 415 U.S. 486, 497, 94 S.Ct. 1186, 1193, 39 L.Ed.2d 530 (1974).

The parties vigorously dispute the relevant market. Plaintiffs describe a world market of noncommunist gold mining, excluding scrap and official government resources. Positing such a market, plaintiffs argue that the interests which Anglo significantly controls demonstrate it currently has a 20% market share and is the largest producer of gold in the world. Gold Fields has a 12% share and is second in the world. A combination of the two would allow Anglo to control approximately one-third of the market. Courts have frequently invalidated corporate combinations where the resulting increase in concentration is less than the increase that would attend the takeover as plaintiffs have portrayed it. *See, e.g., United States v. Pabst Brewing Co.*, 384 U.S. 546, 550–52, 86 S.Ct. 1665, 1668–69, 16 L.Ed.2d 765 (1966) (combina-

tion of tenth and eighteenth firms, with a combined market share of 4.49%); *United States v. Von's Grocery Co.*, 384 U.S. 270, 277, 86 S.Ct. 1478, 1482, 16 L.Ed.2d 555 (1966) (combination of the third and sixth firms with a combined Los Angeles area market share of 7.5%); *United States v. Philadelphia Nat'l. Bank*, 374 U.S. 321, 364, 83 S.Ct. 1715, 1742, 10 L.Ed.2d 915 (1963) ("Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat."); *Stanley Works v. FTC*, 469 F.2d 498, 500–01 (2d Cir.1972) (combination of firm with 1% and firm with 22–24%), *cert. denied*, 412 U.S. 928, 93 S.Ct. 2750, 37 L.Ed.2d 155 (1973).

Furthermore, the Department of Justice merger guidelines, considered to be "conservative" in the sense of erring on the side of allowing takeovers to proceed, indicate that the Antitrust Division of the Justice Department would probably challenge such a merger. U.S. Dept. of Justice, Merger Guidelines, *reprinted in*, 2 Trade Reg.Rep. (CCH) ¶ 4490 (1986). The guidelines measure the market concentration thresholds attending horizontal mergers in terms of the Herfindahl–Hirschmann Index ("HHI"). The HHI evaluates market concentration through a formula that accounts for the relative size and distribution of the firms in a particular market. The HHI is simply the sum of the squares of each firm's market share in the relevant market. This index, which is generally understood to be a rather sensitive barometer of market concentration, increases as the number of firms in the market decreases and as the disparity in size among those firms increases.

In most circumstances, mergers resulting in an HHI of less than 1000 will not be challenged. The guidelines view as suspect any merger that will "produce an increase in the HHI of more than 100 points" and a post-merger HHI of between 1000 and 1800. A market with an HHI exceeding 1800 is considered highly concentrated such that an acquisition which increases the HHI by more than 50 presents serious anti-

trust problems. The concentration level in the gold market after a successful takeover would be 1223.2. This post-merger HHI would be the result of an increase of 488.1. (*See* to McAnneny Affidavit Exh. 9) As such, the merger would probably lead to a government challenge.

■ In response, defendants contest the exclusion of production by communist governments, scrap gold, official reserves, and investment gold in the market. Adding those to the market would result in a post-acquisition market concentration, as measured by the HHI, of 685, below the level at which the government would probably challenge a takeover, but still an increase of 213.1. (*See* McAnneny Affidavit Exh. 7) Even under this calculus, however, post-merger Anglo will account for over 20% of the world market, a share which courts in the past have also condemned. *See, e.g., Pabst Brewing,* 384 U.S. at 550–52, 86 S.Ct. at 1668–69. Moreover, defendants' definition of the market is obviously overinclusive. The benchmark for including a substitute in a market is that sales of the substitute rise significantly in response to a non-temporary 5% or more increase in prices. But, as the past seven years have demonstrated, private investor and communist sales react precisely opposite to increases in gold prices, leading to the logical conclusion that those sources should not be included in any definition of the market. (Reply Declaration of Stewart ¶ 16)

Scrap is a thornier problem. Unlike other metals, gold retains its full value as "scrap." Defendants' argument that "gold is gold" is intuitively more appealing, although scrap has seemed to respond sluggishly, if at all, to phenomenal increases in price over the last few years. (*See* Reply Declaration of Stewart ¶ 16) Yet even including scrap leaves a post-takeover Anglo with approximately 24% of the world market in gold, clearly of the stature which past cases have condemned. Moreover, none of the mitigating factors in other cases, where no anticompetitive effects were found, exist here. To the contrary, those factors demonstrate that the gold market is ripe for greater concentration.

In *United States v. Waste Management,* 743 F.2d 976 (2d Cir.1984), the Second Circuit allowed an acquisition to proceed because market entry in the waste disposal industry was relatively easy. No party here claims that entry is easy in the gold production market. To the contrary, gold production requires not only a great deal of capital investment to start up, but is also heavily regulated. Gold, unlike other commodities, is a homogeneous and limited natural resource. This combination of factors leads to the ineluctable conclusion that the gold market is a prime candidate for monopolization. There is also no allegation that any firm is in serious financial trouble as in *Lektro–Vend Corp. v. Vendo Co.,* 660 F.2d 255, 275 (7th Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). To the contrary, all firms are enjoying tremendous profits.

It is also significant that De Beers, one of the main protagonists in this takeover, has apparently sought to monopolize the world supply of diamonds. As recently as 1974, De Beers affiliates have been indicted for, *inter alia,* price fixing. In its annual report, De Beers describes that it has the ability to "maintain price stability by adjusting supplies ... to demand, while maintaining ... purchases at a reasonable level in terms of quota arrangements," a goal it views as "essential to the diamond industry." (First Kaplan Dec. Exh. 6 at 50) Although this factor is certainly not dispositive, it is indicative of the past behavior of these parties and is thus somewhat relevant to the probable impact of this takeover on the gold market. Thus, plaintiffs have demonstrated at least *prima facie* more than a likelihood of success on the merits of their Clayton Act claim.

In response, Minorco mounts an array of challenges against these statistics. Minorco argues that it is an investing company, not a mining company, and thus that Anglo and De Beers' commanding share of the market cannot be imputed to it. Anglo and De Beers, which together own over 60% of Minorco, own outright most of their mining concerns. In addition, Anglo owns 39.8% of, and has effective control over, the affairs of another large South African gold

mining house, JCI. Moreover, plaintiffs have presented substantial affidavits and other evidence demonstrating that the entire group is controlled by Harry Oppenheimer through Central Holdings. Minorco's argument is thus without merit.

■ Minorco also promises that, after the takeover, defendants will divest themselves of Gold Fields' South African Mines and Newmont. Their announced intention of selling Gold Fields' South African Mines or Newmont should properly be accorded no weight in a preliminary injunction hearing. *United States v. Atlantic Richfield Co.*, 297 F.Supp. 1061, 1073–74 (S.D.N.Y.), *modified,* 297 F.Supp. 1075 (1969), *aff'd Bartlett v. United States,* 401 U.S. 986, 91 S.Ct. 1233, 28 L.Ed.2d 527 (1971); *Cf. United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 607, 77 S.Ct. 872, 884, 1 L.Ed.2d 1057 (1957) (the test of a violation of § 7 is "whether, at the time of suit, there is a reasonable probability that the acquisition is likely to result in the condemned restraints.") Minorco also asserts that a standstill agreement between Gold Fields and Newmont prevents Gold Fields from taking over Newmont's management. Because the proposed acquisition will place Minorco in Gold Field's place, the argument advances, Minorco cannot obtain control of Newmont. Minorco, however, is not a party to that agreement, and thus could breach it without fear of suit. Moreover, the agreement does not prevent Minorco from combining forces with a dissenting shareholder owning just over 1% of the stock in an effort to disrupt the company's operations.

Finally, defendant argues that, because South African mining laws require mines in that country to sell all gold to the government which then fixes price and output, Minorco does not really have the power to raise prices and restrict output—classic indicia of market power. South African mining regulations provide that all gold mined in South Africa, once placed in metallic form, must be sent to the Rand Refinery, which is controlled by the six major mining houses in South Africa. The refinery does not purchase the gold sent to it; it immediately refines the gold and then sells it to the government's Reserve Bank as agents for the mine, retaining a small commission. The price paid by the Reserve Bank is based on the average of the last two "fixings"—official quotations—for gold traded on the London gold market. (Milling–Stanley Affidavit ¶ 3)

Additionally, because the South African government requires each mine operator to tailor its output based on its ore grade and ore reserve levels, Minorco argues that defendants' ability to curtail supply in order to increase price is severely compromised. (Christian Declaration ¶ 12) Thus, Minorco argues that this case is analogous to *United States v. General Dynamics Corp.*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974), in which the Supreme Court held that a coal company's power to affect price and output was significantly lessened because coal reserves were committed by long-term contracts with large customers.

Anglo, however, has far more control over price and output than Minorco concedes. First, plaintiffs note that South African companies can delay turning gold ore into metallic ore by holding the gold in any intermediate form. (Milling–Stanley Affidavit ¶ 4) Second, and more important, the government price is not an arbitrary one, but is based on current market price. The government essentially acts as a mere conduit through which defendants obtain the market price for their gold. Thus, even accepting defendant's argument that mining companies have no control over output, they can affect price by restricting output outside South Africa in order to increase the world price for gold and reap greater profits from the South African mines. This is precisely what Newmont fears defendants will do: namely, shut down Newmont, decreasing supply, and reap increased profits from the resulting increases in world prices.

■ Plaintiffs' Sherman Act Section 2 conspiracy to monopolize and Section 1 claims need only be touched on. Plaintiffs, after spending hundreds of pages alleging that the Anglo group forms a single economic unit, now ask this court to reverse

field and find that Anglo–American, De Beers, and Minorco are separate entities "conspiring" with each other so as to bring this takeover within the reach of the Sherman Act. Such a claim is devoid of record evidence. Plaintiffs also claim that the investment advisors, financial and public relations assistants Minorco has hired are "conspiring" with Minorco. Nevertheless, plaintiffs, for the bulk of their brief, have described these actors as mere pawns or agents of Minorco in demonstrating why this court has jurisdiction over defendants. I decline to presume otherwise now. Officers or employees of the same entity cannot provide the "plurality of actors imperative for a … conspiracy." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769, 104 S.Ct. 2731, 2741, 81 L.Ed. 2d 628 (1984).

■ In sum, plaintiffs Newmont and Newmont Gold have demonstrated a likelihood of success on the merits of their Clayton Act allegations. However, finding a likelihood of success on the merits of the Clayton Act claim does not end this court's inquiry. Plaintiffs must also demonstrate irreparable harm. *Arthur Guinness & Sons, PLC v. Sterling Publishing Co.*, 732 F.2d 1095, 1099 (2d Cir.1984). Once a tender offer has been consummated, it becomes virtually impossible to "unscramble the eggs." For this reason, a preliminary injunction is generally the only effective remedy for an unlawful merger. *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 600 F.Supp. 1326, 1332 (E.D. Mich.), *aff'd*, 753 F.2d 1354 (6th Cir.), *petition dismissed*, 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985). Given that many of the assets to be combined through Minorco's acquisition would be located abroad, the task of unscrambling assets after-the-fact might well be impossible for an American court to accomplish. *See also Piper v. Chris–Craft Ind.*, 430 U.S. 1, 41, 97 S.Ct. 926, 949, 51 L.Ed.2d 124 (1977) ("[I]n corporate control contests the stage of preliminary injunctive relief, rather than post-contest lawsuits 'is the time when re-

lief can best be given.'") (*quoting Electronics Specialty Co. v. Int'l Controls Corp.*, 409 F.2d 937, 947 (2d Cir.1969).

Just as important, the high probability that the takeover will substantially lessen competition in a market of vital interest to the nation's economy threatens both Newmont and the public at large. *Cf. Grumman Corp. v. LTV Corp.*, 665 F.2d at 16; *Gulf & Western Ind., v. Great Atl. & Pac. Tea Co.*, 476 F.2d 687, 698 (2d Cir.1973). The risk to United States and world markets of allowing defendants even temporarily to dominate the world gold market indicates that "doubts as to whether [a preliminary] injunction … is necessary to safeguard [them] … should be resolved in favor of granting the injunction." *Gulf & Western*, 476 F.2d at 699. In sum, the risk of irreparable harm requires the granting of an injunction.

Additionally, plaintiffs have shown at the very least sufficiently serious questions going to the merits combined with the balance of hardships tipping in plaintiffs' favor to warrant a preliminary injunction. *Roso–Lino Beverage Distribs. v. Coca–Cola Bottling Co. of N.Y.*, 749 F.2d 124, 126 (2d Cir.1984). Plaintiffs and the public at large face imminent harm from the takeover's effect in decreasing competition in the world gold market. Moreover, once a takeover has occurred, as I have indicated, it is difficult, if not impossible, for courts to unscramble the eggs. Defendants, for their part, claim hardship because British takeover rules limit their offer to 60 days. But, as plaintiffs indicated at oral argument, this limit can be and frequently is extended by the Monopolies Commission. (10/21/88 Tr. p. 61)

Accordingly, defendant Minorco[6] and each of its officers, directors, employees and agents and all others acting in concert with them are enjoined, pending the final determination of this action, from:

(a) acquiring or attempting to acquire in any manner any securities or stock of

---

**6.** Defendants Anglo–American and De Beers have not yet appeared in this action, but it would seem that, because Minorco is the actual

tender offeror, the injunction need not at this time be extended to them.

plaintiff Gold Fields beyond 30% thereof; or

(b) transferring any interest in securities or stock of Gold Fields without the approval of this Court to any of the following persons or entities: Anglo American Corporation of South Africa Limited, De Beers Consolidated Mines Limited, Johnson Matthey PLC, Charter Consolidated PLC, Inspiration Resources Corporation, Rustenburg Platinum Holdings Limited, Johannesburg Consolidated Investment Company Limited, Engelhard Corporation, E. Oppenheimer & Sons, Central Holdings Limited, Central Holdings Investment Limited, Central Holdings International Limited, the direct and indirect subsidiaries of each of the foregoing, and each person or entity in which the foregoing, directly or indirectly, beneficially holds or controls, individually or in the aggregate, 25% or more of the voting stock or equity interest.

SO ORDERED: