**CONSOLIDATED GOLD FIELDS, PLC,** Newmont Mining Corporation, Newmont Gold Company, and Gold Fields Mining Corporation, Plaintiffs,

v.

**ANGLO AMERICAN CORPORATION OF SOUTH AFRICA LIMITED,** De Beers Consolidated Mines Limited, and Minorco, S.A., Defendants.

**No. 88 Civ. 7191 (MBM).**

United States District Court, S.D. New York.

April 17, 1989.

On Motion for Reargument April 24, 1989.

Lewis A. Kaplan, Lewis R. Clayton, Charles R. Chase, Daniel G. Cort, Robert Epstein, Steven Fasman, Bruce Handler, Elizabeth J. Holland, Doreen Le Pichon and Alexander M. Vasilescu, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiffs Consol. Gold Fields, PLC and Gold Fields Mining Corp.

Richard J. Holwell, Ronald W. Davis and James Perkins, White & Case, New York City, for plaintiffs Newmont Mining Corp. and Newmont Gold Co.

Jeremy G. Epstein, Rachel E. Deming, Kenneth A. Freeling, Edward Han, Jennifer S. Bard, Alan S. Goudiss, Idelle R. Abrams and Karen S. Hart, Shearman & Sterling, New York City, for defendant Minorco, S.A.

## OPINION AND ORDER

MUKASEY, District Judge.

Defendant Minorco, S.A., has moved pursuant to Fed.R.Civ.P. 60(b)(5) to modify the preliminary injunction that prevents it from acquiring shares in Consolidated Gold Fields Ltd. ("Gold Fields") so it can proceed with the acquisition, while holding separate pending divestiture within one year Gold Fields' minority shareholdings in Gold Fields of South Africa ("GFSA"), Newmont Mining Corp. ("Newmont") and Renison Goldfields Ltd. ("Renison") In a memorandum and order dated March 24, 1989,[1] I found that the Second Circuit's decision, *Consolidated Gold Fields PLC v. Anglo American Corp. of South Africa Ltd.*, 871 F.2d 252 (2d Cir.1989), affirming this court's preliminary injunction on antitrust grounds, 698 F.Supp. 487, did not foreclose consideration of a less drastic remedy such as a hold separate order. I instructed the parties to brief this question. Because the Second Circuit also found subject matter jurisdiction over the securities claims and remanded them, I asked the parties also to brief the propriety of issuing an injunction ordering corrective disclosure of misleading statements or omissions in Minorco's tendering documents. As explained more fully below, I find that a hold separate order would not be appropriate in this case. I find also that plaintiffs' allegations of securities violations are without merit and, accordingly, refuse to order any corrective disclosure.

## I. Background

The facts underlying this hotly fought litigation are reported in both my October opinion, 698 F.Supp. at 490–93, and the Second Circuit's opinion, at 255–56. Therefore, I need only sketch the pertinent facts. In October 1988, Minorco made its offer for 70% of Gold Fields' outstanding shares, having purchased approximately 30% some years earlier. Gold Fields promptly sued, seeking both injunctive relief under § 16 of the Clayton Act, 15 U.S.C. §§ 18, 26 (1982), and corrective disclosure for alleged misstatements and omissions in Minorco's offering documents pursuant to §§ 10(b) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78n(e) (1982), and S.E.C. Rule 10b–5, 17 C.F.R. § 240.10b–5 (1988), promulgated thereunder.

Gold Fields, a British corporation engaged primarily in the exploration, mining, and sale of natural resources, most notably gold, wholly owns Gold Fields Mining Corporation ("GFMC"), a Delaware corporation headquartered in New York with gold mining operations in California and Nevada. Gold Fields also has a 49.3% stake in Newmont, a Delaware corporation headquartered in New York. Newmont, in turn, owns 90% of Newmont Gold, the larg-

---

[1] Because the mandate of the Court of Appeals was not issued until April 12, 1989, and thus this court was not technically empowered to issue any order on March 24, the March 24 memorandum and order is incorporated in full in this order.

est gold producer in the United States. Gold Fields owns as well a 48% interest in Renison, an Australian gold mining corporation, and 38% of Gold Fields of South Africa Ltd., the second largest gold producer in South Africa. Gold Fields and its associated companies account for 12% of the non-communist world's gold production, making it the second largest gold producer in that part of the world.

Minorco, a Luxembourg corporation, is allegedly controlled by codefendants Anglo American Corp. ("Anglo"), a South African corporation, which owns 39.1% of Minorco, and De Beers Consolidated Mines Ltd. ("De Beers"), also a South African corporation, which owns 21% of Minorco. The Oppenheimer family of South Africa owns 7% of Minorco. Considered together, the Anglo group is the largest producer of gold in the non-communist world, accounting for 20.3% of such gold production.

This court enjoined the takeover because the resulting combination would control 32.3% of the non-communist world gold market. The tender offer was also stayed initially by the British Monopolies and Mergers Commission. On January 23, 1989, that Commission determined that Minorco's bid for Gold Fields would not harm the public interest, and lifted its stay. Accordingly, on February 20, 1989, Minorco renewed its offer for Gold Fields' shares, conditioned on the modification or vacatur of this court's injunction. That tender offer expires on April 26 unless Minorco can acquire at least 50% of Gold Fields' shares. Minorco has now asked the court to consider on an expedited basis a less drastic remedy in order to let the acquisition proceed. Minorco proposes a hold separate order for Gold Fields' minority stock interests in GFSA, Newmont and Renison, which together account for 96% of Gold Fields' gold production in 1987.[2] (McAnneny Aff. at ¶ 3; McAnneny Reply Aff. at ¶ 10) This hold separate order would prevent Minorco from exercising any control over those companies. Indeed, Minorco would be required to vote the shares dur-

ing this interim period strictly in proportion to the votes of the other shareholders. Within a year, Minorco would have to sell these minority interests to entities unaffiliated with Anglo, De Beers or the Oppenheimer family. To ensure compliance, Minorco proposes that the court appoint a special master or trustee with broad supervisory and investigative powers to determine that Minorco is not interfering with the entities being held separate and that all sales are conducted in accordance with the order. Minorco also offers to put up a substantial bond, $100 million, to ensure compliance with its proposed order.

In support of its request, Minorco notes that, since this matter was first argued to this court, four government agencies have examined the antitrust claim made here and have determined that this takeover will not impair competition. The United States Department of Justice conducted a pre-acquisition review under the Hart–Scott–Rodino Antitrust Improvements Act of 1976 and, after 30 days of scrutiny, did not request further information before discontinuing its investigation. The Committee on Foreign Investment in the United States, whose members include the heads of five cabinet departments, reviewed this transaction for five months and also took no steps to block it. The British Monopolies and Mergers Commission, which conducted a three-month study, concluded that Minorco's acquisition of Gold Fields would not diminish competition in the world gold market. Finally, the Commission for the European Communities, which has antitrust jurisdiction over all of the Common Market countries, reached a similar conclusion after a four-month study.

Minorco also notes the adverse consequences of injunctive relief for Gold Fields' shareholders. Approximately 15% of the market value of Gold Fields, nearly three-quarters of a billion dollars, was wiped out in one day's trading on the London Stock Exchange on March 23, the day following the Court of Appeals' decision affirming

---

**2.** GFMC's market share, even using its 1988 production figures, amounts to only 0.8% of the

non-communist world gold market.

the injunction. Although plaintiffs note that Gold Fields' stock has since risen in price, there is no question that, if this injunction is continued, Gold Fields' shares will once again plummet.

## II. Propriety of a Hold Separate Order

Both sides vigorously dispute the applicable burden of proof in determining whether a hold separate order is warranted here. Minorco, citing two cases, *FTC v. Dean Foods Co.*, 384 U.S. 597, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1966) and *FTC v. PepsiCo, Inc.*, 477 F.2d 24 (2d Cir.1973), argues that a preliminary injunction is appropriate only when it has been shown that "an effective remedial order, once the merger [is] implemented, would otherwise be virtually impossible, thus rendering the enforcement of any final decree of divestiture futile." *Dean Foods*, 384 U.S. at 605, 86 S.Ct. at 1743; *see also PepsiCo*, 477 F.2d at 28–29 (applying virtual impossibility test). Thus, Minorco contends, this court is under an affirmative obligation to consider less extreme relief pending a trial on the merits.

Plaintiffs correctly note that Minorco made this same argument to the Court of Appeals when it claimed this court erred in refusing to consider remedies less drastic than a preliminary injunction. In affirming this court's issuance of a preliminary injunction, the Circuit Court expressly rejected this contention, noting that "[a] preliminary injunction is ... the remedy of choice for preventing an unlawful merger." At 261. Moreover, *Dean Foods* and *PepsiCo* are inapplicable to the situation at hand. The issue in *Dean Foods* was whether the Federal Trade Commission could obtain a preliminary injunction in a merger case despite lack of statutory authority. The Supreme Court found authority for such injunctions in the All Writs Act, 28 U.S.C. § 1651; the statement quoted above reflected a view that such authority must be used sparingly. That holding was applied in *PepsiCo*. By contrast, § 16 expressly authorizes private plaintiffs to seek injunctions.

Plaintiffs brandish the Second Circuit's statement that an injunction is "the remedy of choice" as evidence, not only that the Circuit Court found consideration of less drastic remedies not mandatory, but also that the Court meant to foreclose the possibility of less drastic relief such as a hold separate order. As I explained in my memorandum and order of March 24, 1989, there is simply no evidence that the Circuit Court foreclosed reconsideration of the remedy in this case. The Circuit's statement that preliminary injunctions are the "remedy of choice" means just that: there is a presumption in favor of preliminary injunctions. It does not bar consideration of less drastic remedies.

Plaintiffs are equally incorrect in citing *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072 (D.C.Cir.1981), and *FTC v. PPG Indus., Inc.*, 798 F.2d 1500 (D.C.Cir.1986), for the proposition that defendants have a "difficult burden" in demonstrating that less drastic remedies are more appropriate. Those cases involve a relatively new provision, § 13(b),[3] granting the FTC explicit authority to seek preliminary injunctions. The question in those cases was thus the opposite of *Dean Foods* and *PepsiCo*. Instead of whether the FTC had authority to seek any form of injunctive relief, the question became whether Congress expressly limited relief to preliminary injunctions or allowed the FTC to sue for other forms of relief, including hold separate orders and divestiture. One judge dissented in *Weyerhaeuser*, noting that if Congress intended to allow the FTC to seek other forms of relief, it would not have used specific language like "preliminary injunction." *Weyerhaeuser*, 665 F.2d at 1091 (Mikva, J., dissenting). It is no wonder then that the courts in *Weyerhaeuser* and *PPG*, although finding that hold separate orders were available, placed a "heavy" and "difficult" burden on defendants to show that a preliminary injunction was not warranted.

---

**3.** Section 13(b) provides that: "[T]he Commission ... may bring suit ... to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest ... a temporary restraining order or a preliminary injunction may be granted without bond...."

■ Nevertheless, I need not travel far to find the answer to this question. Indeed, the question of burden has already been decided in this case: Judge Newman specifically stated that preliminary injunctions in corporate control cases are the "remedy of choice." That statement suggests a presumption for issuing preliminary injunctions in such cases; it follows, then, that Minorco has the burden—albeit not a "heavy" or "difficult" one—to show that a less drastic remedy will serve all the legitimate purposes of a preliminary injunction.

■ Even if defendants have the burden, may this court consider a hold separate order, along with divestiture, in a § 16 private antitrust lawsuit? Hold separate orders with divestiture requirements are often directed in lawsuits brought by the government; only a few cases have been reported considering such relief when plaintiffs are private parties. *See Pargas, Inc. v. Empire Gas Corp.*, 423 F.Supp. 199, 246 (D.Md.) (citing cases involving private parties), *aff'd*, 546 F.2d 25 (4th Cir.1976). None of those cases considered whether § 16 empowers a federal court to order such relief. The only cases which touch on this subject involve situations where a private plaintiff seeks divestiture of the offending subsidiary or asset long after the merger or purchase has been accomplished. The First Circuit allowed such relief in *CIA. Petrolera Caribe, Inc. v. ARCO Caribbean, Inc.*, 754 F.2d 404 (1st Cir.1985). The Ninth Circuit concluded that divestiture was not available under § 16. *International Telephone & Telegraph v. GTE Corp.*, 518 F.2d 913, 924 (9th Cir.1975). The circuits part company on whether the term "injunctive relief" as known at the time Congress passed the Clayton Act included divestiture. In any event, their dispute does not concern us here. The Ninth Circuit qualified its holding in a way directly relevant to the question of whether this court has the power to order such relief:

> In holding that the remedy of divestiture is not available we do not jeopardize [a] ... court's ability to restrain [a defendant] effectively from violating the antitrust laws. Injunctive remedies under § 16 may be as broad as necessary to ensure that "threatened loss or damage" does not materialize or that prior violations do not recur.

518 F.2d at 924–25. Thus, it is within this court's equitable power to order any form of injunctive relief, including a hold separate order and divestiture.

■ What, then, are the factors in determining whether defendants have shown the remedy is adequate? The Supreme Court provided guidance in *Zenith Radio Corp. v. Hazeltine*, 395 U.S. 100, 130–31, 89 S.Ct. 1562, 1580–81, 23 L.Ed.2d 129 (1969), a private antitrust lawsuit:

> [T]he purpose of giving private parties treble damages and injunctive remedies was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws [citation omitted].... Section 16 should be construed and applied with this purpose in mind, and with the knowledge that the remedy it affords [injunctive relief], like other equitable remedies, is *flexible and capable of nice "adjustment and reconciliation between the public interest and private needs as well as between competing private claims."* ... Its availability should be *"conditioned by the necessities of the public interest which Congress sought to protect."*

(emphasis added) (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329–330, 64 S.Ct. 587, 591–92, 88 L.Ed. 754 (1944)). Thus, the Court instructs that private as well as public interests should be considered in fashioning the most appropriate form of relief, even where the plaintiffs are private. The parties provide various factors they believe important in conducting such a balancing test. Plaintiffs point to *Weyerhaeuser* and *PPG* which set out the following test for § 13(b) injunctive relief:

> (1) significant equities favor the transaction and

> (2) a hold separate order realistically can be expected

>> (a) to safeguard adequate eventual relief and

(b) to check interim anticompetitive harm.

*Weyerhaeuser*, 665 F.2d at 1085. Although, as I have indicated, § 13(b) cases do not govern, they may nonetheless guide because both § 13(b) and the Second Circuit's decision in *Gold Fields* place a presumption in favor of preliminary injunctions. Not surprisingly, *Weyerhaeuser* and *PPG* also point toward the two main goals in fashioning a remedy: checking interim anticompetitive harm and safeguarding adequate eventual relief. Although Minorco challenges whether a preliminary injunction is presumptively the correct relief in corporate control contests, as the Second Circuit and this court have found, Minorco does not seriously dispute the factors this court must consider in determining whether a hold separate order would be appropriate. Indeed, in an affidavit Minorco has submitted on this motion, J. Paul McGrath, a former assistant attorney general in the Justice Department's antitrust division, enumerates some of the same factors that comprise the *Weyerhaeuser* test. His list of factors is as follows:

(A) The risk that, while the hold separate order is in effect, the acquiror could undermine or weaken the acquired competitive entity thus presenting the world with a less viable competitor after a later divestiture;

(B) The risk that the acquiror could control the acquired competitive entity during the period of the hold separate order to such an extent that there could be a restraint on competition;

(C) The salability of the assets to be held separate to a buyer or buyers who would be appropriate from a competitive point of view;

(D) The Court's ability to enforce the hold separate provision and to ensure that any divestiture is accomplished in a manner consistent with the antitrust laws; and

(E) Any equities or other unique circumstances calling for the exercise of balanced judgment in evaluating the situation.

(McGrath Aff. at ¶ 8) That list elucidates the *Weyerhaeuser* standard and helps in considering the merits of a less drastic remedy. The first two factors go to checking interim anticompetitive harm; the second two concern assuring eventual relief. The fifth factor—a catch-all—is similar to *Weyerhaeuser's* mandate that significant equities, both private and public, favor the transaction. I will consider each of *Weyerhaeuser's* elements, bearing in mind McGrath's list of considerations.

A. *Equities*

■ The first equity is the public interest. A factor considered in § 13(b) cases, the strength of plaintiffs' showing of likelihood of success on the merits, is relevant in analyzing the public interest. Likelihood of success on the merits is considered in § 13(b) cases precisely because the statute requires it: "[u]pon a proper showing that, weighing the equities and *considering the Commission's likelihood of ultimate success*, such action would be in the public interest...." 15 U.S.C. § 53(b) (emphasis added). Section 16 has no similar language; accordingly, traditional notions of equity are meant to apply. *See Zenith Radio*, 395 U.S. at 130, 89 S.Ct. at 1580 ("§ 16 ... invokes traditional principles of equity ...") However, as *Zenith Radio* counsels, likelihood of success must be considered in determining the public interest that may be compromised by harm to competitive markets.

Likelihood of success does not support plaintiffs' position. Without revisiting this question or revising the views expressed in the October decision, plaintiffs' showing was hardly so strong or probative of serious anticompetitive harm as to make inappropriate a hold separate order. Under the definition of the gold market most favorable to plaintiffs—current non-communist mine production—the Herfindahl–Hirschmann Index ("HHI") would be 1223.2 out of a theoretically possible 10,000 at 100% concentration. *See* 698 F.Supp. at 500–01 (describing formulation of the HHI) When the market is defined to include scrap recovery, however, a definition which has some support in the record, 698 F.Supp. at

501, the post-merger HHI falls to 732. Because, in most circumstances, mergers resulting in an HHI of less than 1000 will not be challenged by the Justice Department, plaintiffs' showing on the merits of this case is hardly overwhelming. Furthermore, although Justice Department guidelines are somewhat conservative, they demonstrate that the gold market is relatively unconcentrated. Again, it should be noted that this court, in deciding the motion for a preliminary injunction, resolved all doubts in plaintiffs' favor. Minorco has now raised questions about the propriety of plaintiffs' definition of the market and the responsiveness of gold production to price fluctuations. Those matters must await trial, but clearly plaintiffs have not proved an overwhelming case of anticompetitive harm. Although this is not a case where the takeover will increase employment in a depressed sector, as in *Weyerhaeuser*, or otherwise benefit the public interest, the public interest is not necessarily in plaintiffs' favor because plaintiffs have failed to prove an overwhelming case of likelihood of success in showing that the takeover will assuredly increase concentration in the gold market.

Indeed, when one considers that the takeover has not been challenged by the U.S. Justice Department, the Committee on Foreign Investment in the United States, or by the British or Europeans, each of whom studied the antitrust ramifications over an extended period of time, the public interest weighs slightly in favor of Minorco.

One other public interest factor to be considered in fashioning relief here is international comity, which would seem to oppose completely barring this takeover. On the other hand, for this court to micromanage these foreign corporations for an extended period of time while administering and policing a hold separate order would seem to violate notions of territoriality even more. At best, comity concerns here are a wash.

Next come the private equities. Plaintiffs correctly note that Minorco's right to consummate the deal is not an equitable factor in its favor.[4] *See Grumman Corp. v. LTV Corp.*, 665 F.2d 10, 16 (2d Cir.1981) ("The Grumman shareholders are not entitled to a gain obtained from a sale that presents a substantial likelihood of violating § 7."); *PPG*, 798 F.2d at 1507 (quoting *Weyerhaeuser*, 665 F.2d at 1083 n. 26) (the " 'mere expectation of private gain' " for a transaction shown probably to violate Section 7 does " 'not rank as a private equity meriting weight.' ")

Gold Fields shareholders, however, do have a legitimate interest in preventing a decline in the value of their shares if the takeover is halted. Given the decline in Gold Fields' stock price after the Court of Appeals decision, I have no doubt that the price of such shares will drop if the takeover is permanently halted. *FTC v. Exxon Corp.*, 636 F.2d 1336, 1344 n. 26 (D.C.Cir. 1980) ("If consummation of the transaction is barred, shareholders of the to-be-acquired corporation will bear any subsequent decline in value of the stock from the acquisition price."); *FTC v. Owens–Illinois, Inc.*, 681 F.Supp. 27, 53 (D.D.C.) ("Courts can take shareholder losses into account" in fashioning equitable relief in antitrust cases.), *vacated as moot*, 850 F.2d 694 (D.C.Cir.1988); *but see Laidlaw Acquisition Corp. v. Mayflower Group, Inc.*, 636 F.Supp. 1513, 1521 (S.D.Ind.1986) ("Neither [the bidder], nor the shareholders of [the target], are entitled to any gain obtained from a sale that presents a substantial likelihood of violating the Clayton Act.") Thus, private interests weigh slightly in favor of this transaction. When one adds the public interest, which I found also slightly favor this transaction, defendants have shown sufficient equities to satisfy this element of the test.

## B. *Interim Anticompetitive Harm*

Plaintiffs mount an array of arguments in support of their theory that the hold separate order will cause interim anticom-

---

**4.** A related question is whether defendants may "profit" by selling antitrust-offending assets of the target. Plaintiffs' argument that Minorco cannot reap such benefits is flawed because the sale cannot possibly cause antitrust injury; rather, it solves any antitrust problem.

petitive harm. First, they argue that breaking up Gold Fields would itself be anticompetitive. Second, they contend that Minorco's retention of GFMC also violates the antitrust laws because the top competitor would thus acquire a low-cost producer. Third, they claim that Minorco would retain influence over GFSA because the Anglo group now owns 21.1% of that company and the hold separate order would require it to sell only Gold Fields' shares in GFSA and not its own. Fourth, plaintiffs argue that Newmont would be hurt because management officials, fearing the results of a possible sale, would leave, and credit markets would be wary of Newmont; Newmont also would be adversely affected by its association with a South African entity. Fifth, plaintiffs contend that Newmont has recently embarked on an aggressive plan to triple its production by the year 1990, and that Minorco will have an incentive, because its holdings are in high-cost South African mines, to suppress Newmont's plans.

Plaintiffs' first contention is that, because the Court of Appeals found that Gold Fields has standing, the proposed hold separate order would violate Gold Fields' own right to exist. In other words, they posit that a hold separate order would require defendants to hold Gold Fields *itself* separate. Hold separate orders are concerned with holding separate the entities controlling the assets whose acquisition might offend the antitrust laws. Because Gold Fields is essentially a holding company, Gold Fields has no independent right to exist, protected by the antitrust laws, apart from the gold-producing companies it operates. Nor does it matter that Gold Fields has facilitated the development of these companies by providing profitable "synergistic" inputs. The result is not changed by framing the issue as whether Gold Fields and its subsidiaries shall continue under common control or be scattered to the four winds, so long as Anglo does not pick up critically large pieces. There is no evidence that breaking up the second largest gold company will leave Anglo free to dominate the market. The gold market is neither so concentrated nor so fractured

that such a result could occur. Indeed, as Minorco points out, when plaintiffs argue that Gold Fields has an independent right to exist, plaintiffs ask this court to endorse increased concentration. The antitrust laws are not concerned with ensuring the survival of large economic actors; rather, the concern is that mergers avoid any anticompetitive effect. The antitrust laws were enacted "for the protection of *competition,* not *competitors.*" *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (emphasis in original). Breaking up Gold Fields and selling off Newmont, GFSA and Renison would serve that interest.

Nor are plaintiffs any more convincing in their argument that Minorco's retention of GFMC, which accounts for a mere 0.8% of the non-communist world gold market, would itself violate the antitrust laws. This merger will result in a postmerger HHI of 910, well below the 1000 threshold level at which the Justice Department would consider challenging the merger. Positing GFMC as a low-cost competitor, plaintiffs claim this merger is analogous to the one at issue in *Stanley Works v. FTC,* 469 F.2d 498 (2d Cir.1972), *cert. denied,* 412 U.S. 928, 93 S.Ct. 2750, 37 L.Ed.2d 155 (1973), where the court held illegal a combination of an industry leader with 22–24% of the market with a dynamic competitor holding just 1% of the market. *Stanley Works* is inapposite because the gold market is much less concentrated than the market considered in that case. In *Stanley Works,* the court specifically found that the market was *"already* concentrated" before the merger. 469 F.2d at 504 (emphasis in original). The gold market, defined most restrictively, has a pre-acquisition HHI of 735, well within the range the Justice Department considers unconcentrated. In *Stanley Works,* the top four firms, before the merger, made up 49–51% of the market. 469 F.2d at 501. By contrast, the seven top firms share 50.8% of the gold market. (Joint Appendix at 995)

Plaintiffs' theory that the Anglo group's ownership of 21.1% of GFSA's shares would allow it undue influence over the

company, even after the shares Gold Fields owns in it are sold, is also without merit. The only way Anglo could become the largest owner is if Gold Fields' interest in GFSA is parcelled out to many buyers rather than sold to only one company. Gold Fields' interest in GFSA will most likely be sold as a block to Rembrandt, a buyer chosen by Gold Fields itself and to which Gold Fields granted a right of first refusal. (Lea Dec. at ¶ 4) Moreover, even if Rembrandt did not accept the offer, the hold separate order could be amended easily to require that Gold Fields' interest in GFSA be sold as a block to one buyer.

Minorco is at its most effective in rebutting plaintiffs' argument that Newmont will be tarnished by its association with a South African company and will find itself in difficulty with the United Mine Workers union, which supports anti-apartheid political activity. Minorco has conclusively demonstrated that Gold Fields itself has significant ties to South Africa, ties which are at least as damning as Minorco's connections to South Africa. (Richards Aff. at ¶ 3; Epstein Reply Aff., Exh. 6) Indeed, Gold Fields' connections are, if anything, more perceptibly tied to the injustices of apartheid. GFSA has one of the largest private armies in South Africa, "complete with dogs, armored vehicles and its own patented rubber bullets," which it uses in labor strikes. (Kaplan Dec. sworn to on March 31, 1989, Exh. 27 at 6) It has also allegedly discouraged unionization by black workers and has exploited the excess of unskilled black workers to keep their wages low, while skilled white workers receive far more. (Gotbaum Aff. at ¶ 7) As a result, only 7% of its black work force belongs to the South African National Union of Mineworkers. (Gotbaum Aff. at ¶ 5). Victor Gotbaum, a New York City municipal union leader, concludes that "no responsible union leader would prefer to deal with a company affiliated with Gold Fields rather than one affiliated with Anglo American.... GFSA's record on race relations and unionization is so bad that any responsible American company should be ashamed to be associated with them." (Gotbaum Aff. at ¶ 4, 6)

As for the claimed loss of credit and personnel during the pendency of a hold separate order, if any such damage were likely, it would have happened during the several years that T. Boone Pickens and, later, Minorco sought to acquire Newmont. Indeed, most of Newmont's credit problems arise from over-leveraging in fighting off Pickens. (Loomis Aff. at ¶ 3) Minorco's proposed sale of the 49% Newmont block could actually improve Newmont's ability to secure credit. (Loomis Aff. at ¶ 4) Additionally, plaintiffs have made no showing that defendants would glean trade secrets or other competitive information from Newmont, effects which the *Weyerhaeuser* court felt would make a hold separate order inappropriate.

Plaintiffs note, however, that Minorco may have an incentive to suppress Newmont's proposed expansion of its low-cost, highly efficient production. Minorco responds that it will not own Newmont outright. Rather, it promises to vote its shares in proportion to the vote of the other outstanding shares. However, one commentator has noted the possibility that a hold separate order in a horizontal merger may lessen competition because, even if the hold separate order is strictly enforced, the acquired company is "likely to realize that [its future] may depend on the success of the [acquiror]" and thus compete less vigorously. *See* Note, *Hold Separate Orders in Government Antimerger Suits*, 70 Geo. L.J. 113, 1358 (1982). *See also Weyerhaeuser*, 665 F.2d at 1086 ("Hold separate orders will ... be contraindicated where the acquired company was planning prior to the acquisition to embark on a new procompetitive venture"). Accordingly, the writer concludes that hold separate plans are inappropriate in horizontal merger cases and that a full stop preliminary injunction is the only remedy. In its October 24 decision, this court noted that, even with minority control over Newmont, the Anglo group had an incentive to "hold Newmont's head under water" if the takeover had been allowed to proceed because the Anglo group owns a lower percentage of low-cost Newmont than of its higher-cost South Af-

rican mines, which it owns outright. 698 F.Supp. at 499. Certainly, the Anglo group would have even more incentive to attempt to tinker with Newmont during the one-year hold separate period. Of course, these concerns are alleviated somewhat by the fact that Minorco must divest its minority ownership in Newmont within one year and thus Newmont's management need not feel that it would eventually come under the thumb of Minorco. Moreover, Newmont would retain its independence so that it could move to hold Minorco in contempt if Minorco interfered with its operations. Further, in order to ensure that GFSA and Renison could also seek relief here from any violation of the hold separate order, Minorco has agreed in advance that they would have standing to challenge Minorco's actions.

But the existence of Anglo affiliates outside this court's jurisdiction makes it impossible for a hold separate order to guarantee against interim anticompetitive harm. Both Anglo and De Beers have defaulted in this action. As explained below, the Anglo group could easily set up corporations in countries which protect the identity of the owners, and through these corporations purchase shares in GFSA, Renison and Newmont. The Anglo group has every incentive to stifle the competitive energy of these direct competitors. Although the three companies would have standing, there is no assurance they could detect a gradual accumulation of shares, or that standing would assure the will to act. Gold Fields itself would no longer be around to object, and the government is not a party to this litigation. Accordingly, I find that the proposed hold separate order would not effectively check interim anticompetitive harm, largely because of the possibility that an Anglo group affiliate not subject to this court's jurisdiction could purchase shares in the companies and suppress their competitive conduct.

### C. *Safeguarding Eventual Relief*

I find it helpful to divide this factor into the two prongs McGrath suggests: (1) ensuring that buyers for the three companies will be appropriate from a competitive point of view, and (2) ensuring that the court can adequately police the hold separate order and the proposed divestiture.

As for potential buyers, plaintiffs note that commentators stress the need for careful scrutiny of the details of a proposed divestiture, particularly because the divestiture "will tend to attract the anti-competitive purchaser." Pfunder, Plaine & Whittemore, *Compliance with Divestiture Orders Under Section 7 of the Clayton Act: An Analysis of the Relief Obtained,* 17 Antitrust Bull. 19, 47 (1972). Moreover, the divesting company and the public have competing interests when it comes to choosing a purchaser:

> [I]t is in the divesting firm's interest to seek out or favor a buyer who will either be cooperative, phlegmatic in his rivalry, or destined to fail. It is in the public's interest that the buyer be independent, a business maverick, and destined to succeed. Consequently, effective antimerger relief requires that the authorities not give the companies involved free rein in this selection.

Elzinga, *The Antimerger Laws: Pyrrhic Victories?,* 12 J.L. & Econ. 43, 65 (1969). However, given the time constraints here, Minorco need not proffer agreements in principle with buyers; rather, it need show only that suitable competitors are seriously interested in the companies. Defendant asserts that it has lined up several potential sales. Some possible purchasers have been designated: for GFSA, Rembrandt Group Ltd. ("Rembrandt") and General Mining Union Corp. ("Gencor"); for Newmont, any of various possible companies to be located and evaluated by Lazard Freres, including two Canadian companies, two Australian companies and two American companies that have expressed interest (Rohatyn Aff. at ¶ 15); for Renison, several potential Australian buyers, with the Aries Group already selected to conduct this sale. Plaintiffs note that if Gencor, a robust competitor, bought all three companies, Gencor would glean an 18% share of the market. However, Rembrandt, a South African company, is the likely purchaser of GFSA, although Rembrandt has warned that it

will not compete in an "auction" with Gencor. (Van Rooyen Aff., Exh. B) That is, Rembrandt might not exercise its right of first refusal if the price is driven up by Gencor's expressed interest. Of course, it would be relatively easy for this court to order that Gencor not be allowed to buy more than one of the three companies. Indeed, this would solve plaintiff's unsubstantiated[5] allegation that Gencor and Anglo are collaborating, and thus that Gencor would not be suitable. Moreover, plaintiffs present no evidence rebutting Minorco's showing that Rembrandt would be a worthy competitor with no anticompetitive side effects. In sum, I find that Minorco has presented sufficient evidence of potential buyers to meet its burden on this point.

Minorco promises to abide by the hold separate order and ultimately to divest. But nothing can stop Anglo and De Beers, both of which have defaulted in this action, as well as other group members, from conspiring to undermine the hold separate order and eventually purchasing shares in the three companies. Even if Minorco exacts promises from purchasers of the companies that those purchasers have no agreement to resell the shares to any member of the Anglo group, nothing can stop a member of the Anglo group from buying the shares the day after divestiture is accomplished. Plaintiffs attempt to forestall this objection by proposing a special master or trustee to act essentially as an adversarial surrogate and faithful monitor to replace vigilant FTC officials who oversee most hold separate decrees. But neither a special master nor a trustee would necessarily be able to identify whether a buyer is actually affiliated with the Anglo group or whether a purchaser of stock in the three companies is not in fact acting for an Anglo group member. The world abounds with jurisdictions where incorporators need not be disclosed, where ownership is evidenced by bearer shares, and where other steps may be taken to assure anonymity. Thus, the Anglo group could create a corporation such that this court would be completely unable to find out who the incorporators were, who the owners were, or how the corporation was created. Indeed, plaintiffs note that South African laws such as the Protection of Business Act (Kaplan Dec. sworn to on March 31, 1989, Exh. 6) enable South African companies to conceal the source of their overseas investments in order to avoid the effects of anti-apartheid laws. The Anglo group could easily use those laws to help create new entities to recapture the three companies.[6]

Defendants contend that such hypothetical possibilities are irrelevant. I disagree. Whether the hold separate and divestiture scheme proposed by Minorco can be substituted for a full stop injunction depends on whether there is any way to prevent a buyer from selling the assets the very next day to an anonymous Anglo corporation, or to prevent such a corporation from purchasing shares during the effective period of the interim hold separate order. To those questions defendants have no answer. Neither the proposed special master, nor any of the three companies, nor this court, can be certain to prevent such anticompetitive results. Although Minorco is correct when it asserts that this court's jurisdiction is not perpetual, I have an obligation to safeguard adequate final relief and protect interim competition. That obligation does not end until a trial is completed and final judgment is entered, which probably would not occur within a year. Thus, I have every reason to be concerned that the order might be undermined by an

---

**5.** Other than a largely irrelevant newspaper clipping, plaintiffs have presented no evidence to support this allegation. In contrast, Minorco has filed an affidavit averring that Gencor is completely independent. (Christian Aff. at ¶¶ 4–5)

**6.** Minorco's contention that this court found enjoining Minorco alone sufficient in October, and thus this court should not require more now, is incorrect. Rather, this court noted that "it

would seem that, because Minorco is the actual tender offeror, *the injunction need not at this time be extended to [Anglo and De Beers]."* 698 F.Supp. at 503 n. 6 (emphasis added). That statement clearly countenanced the possibility that Anglo, De Beers or one of its affiliates would renew the tender offer and, accordingly, the extension of the injunction to cover the new tender offer.

Anglo group affiliate over which this court has no control.

Moreover, although Minorco's promise, backed by a substantial bond and assets in this country, is entirely believable, the Anglo group's record in circumventing legal restrictions and engaging in anticompetitive behavior is not reassuring. In 1980, Anglo affiliates purchased 16.4 million Gold Fields shares in forty minutes in what Gold Fields refers to melodramatically as the "Dawn Raid." Inspectors appointed by the British Department of Trade concluded that "[w]e are satisfied that De Beers formulated its scheme with the express intention of avoiding the disclosure provisions of [English company law]." (Joint Appendix at 462) Finally, the Anglo group has engaged in past cartel behavior. 698 F.Supp. at 501 (describing De Beers' anticompetitive activities). These factors compel the conclusion that this court's lack of jurisdiction over the other entities in the Anglo group could frustrate a hold separate order and divestiture remedy. If that remedy cannot match the reliability of a blanket injunction, then it cannot serve as a substitute.

Accordingly, although I am mindful that there are equities—both private and public —in consummating this transaction, I find that a preliminary injunction is the only suitable remedy. Therefore, defendants' motion for modification of the preliminary injunction must be denied.

## III. Securities Violations

Pursuant to the Second Circuit's direction that this court "should proceed to the merits [of plaintiffs' securities claims] and, if plaintiffs prevail," go on to consider the remedy with due regard for comity principles, at 263, I asked the parties to address whether the securities claims in the supplemental complaint regarding Minorco's second tender offer,[7] demonstrated "(a) irreparable harm and (b) either (1) likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). I now find that plaintiffs' allegations are meritless and, accordingly, decline to order corrective disclosure.

Regarding irreparable harm, the Supreme Court has counseled that "in corporate control contests the stage of preliminary injunctive relief, rather than post-contest lawsuits 'is the time when relief can best be given.'" *Piper v. Chris–Craft Indus.,* 430 U.S. 1, 42, 97 S.Ct. 926, 949, 51 L.Ed.2d 124 (1977) (quoting *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 947 (2d Cir.1969)). *Accord Mobil Corp. v. Marathon Oil Corp.,* 669 F.2d 366, 371 (6th Cir.1981), *cert. denied,* 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982); *Sonesta Int'l Hotels Corp. v. Wellington Assoc.,* 483 F.2d 247, 250–51 (2d Cir.1973). Plaintiffs have thus sufficiently shown irreparable harm.

Plaintiffs allege the following omissions and material misrepresentations:[8] (1) Mi-

---

7. Plaintiffs do not advance any argument in support of their allegations in the original complaint. It is no wonder since those allegations—to wit, that Minorco has concealed its ties to South African persons and entities (Complaint ¶ 35(b)) and that it has not disclosed the alleged role of a Minorco director in defaulting on claims arising out of asbestos litigation in the United States (Complaint ¶ 35(d))—are either frivolous or have been mooted by Minorco's February tender offer documents.

8. Minorco first argues that this court should defer ruling on the allegations of securities violations because British officials implicitly determined that no material omissions were made when they failed to object to the second tender

offer and that British courts provide relief similar to that provided under the securities laws in the United States. Much of this argument is foreclosed by the Court of Appeals determination that this court has subject matter jurisdiction—"enforcement jurisdiction" in the argot of international law—to consider the securities violations alleged herein. The Court of Appeals directed this court to reach the merits; only when and if a violation is found did the Court of Appeals require consideration of international comity in order to select the appropriate remedy: for example, whether corrective disclosure should be limited to American shareholders or foregone entirely because of the overwhelmingly foreign nature of the transaction. To the extent that Minorco's argument is not foreclosed

norco has failed to disclose properly the basis for valuing the offer at 1412.5][9] per Gold Fields share; (2) Minorco has failed to disclose that the value of Minorco stock is overstated because most of the 79 million new shares to be issued in connection with this offering are bound to be sold on the open market for two reasons: (i) North American shareholders are required to appoint a Minorco agent who will sell their shares in 21 days, and (ii) other Gold Fields shareholders, having no cash alternative, will sell too; this, in turn, will drive down the price of new Minorco shares; (3) Minorco failed to disclose that nearly 80% of its shares are held by the Anglo Group and 20 other recorded owners; consequently, the price of Minorco's shares is likely to be volatile because the number of shares actively traded is relatively small; (4) the offering document asserts that Minorco is "unequivocally committed" to dispose of Gold Fields South Africa, Newmont and Renison; in fact, Minorco does not plan to do this; (5) Minorco has failed to disclose that the State of Michigan, which hold 5.5% of Minorco's outstanding shares through its pension funds, will divest those holdings, further depressing the value of Minorco stock; and (6) Minorco has failed to disclose payments by Oppenheimer family companies to Minorco Chairman Julian Ogilvie Thompson which create a conflict of interest.

■ In *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), the Supreme Court set forth the standard for materiality under the securities laws:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly

altered the 'total mix' of information made available.

This standard applies to Rule 10b–5 as well as § 14(e). *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988). Although a company is not required to engage in "educated guesses or predictions," it must disclose "basic facts so that outsiders may draw upon their own evaluative expertise in reaching their own investment decisions." *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 848–49 (2d Cir. 1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). A company is not required to speculate about future events which are unlikely to occur or which the company is convinced will not occur. Such speculation could easily mislead and confuse shareholders. Furthermore, "corporations are not required to address their stockholders as if they were children in kindergarten." *Richland v. Crandall*, 262 F.Supp. 538, 554 (S.D.N.Y.1967). It is thus sufficient if the company provides information as to material facts in a format from which a reasonable investor could reach his own conclusions as to the risks of the transaction. *See, e.g., Sonesta Int'l Hotels Corp. v. Wellington Assocs.*, 483 F.2d 247, 254 (2d Cir.1973); *Gulf & Western Indus., Inc. v. Great Atlantic & Pacific Tea Co.*, 476 F.2d 687, 697 (2d Cir.1973).

■ Where, as here, the alleged violations occur during a hotly contested battle for control of a target company, the failure of the other side "to correct alleged misstatements or rectify claimed omissions is some evidence that it does not regard them as material." *General Time Corp. v. Talley Indus., Inc.*, 403 F.2d 159, 162 (2d Cir. 1968), *cert. denied*, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969); *see also Seaboard World Airlines, Inc. v. Tiger Int'l, Inc.*, 600 F.2d 355, 364 (2d Cir.1979); *Kennecott Copper Corp. v. Curtiss–Wright Corp.*, 584 F.2d 1195, 1200 (2d Cir.1978). To be sure, "it would emasculate the pur-

---

by the Court of Appeals decision, it makes no sense. Minorco has not cited one case where an American court has stayed its hand because of comity considerations arising from the failure of a foreign executive authority to act when there is no evidence that such failure resulted

from a considered decision as to the adequacy of the offering documents.

**9.** On April 10, 1989, Minorco increased its offer to 1550p per share.

poses of the Williams Act to allow the offeror to look to the target company to remedy the offeror's own material deficiencies in disclosure. The obligation is placed squarely on those making the offer in the first instance to disclose all material factors necessary to make *their offer* not misleading. That duty cannot be shifted to the shoulders of others." *Sonesta Int'l Hotels,* 483 F.2d at 255 (emphasis in original). With these principles in mind, I turn to each of these six contentions to determine whether plaintiffs have shown a likelihood of success.

■ Plaintiffs first claim that Minorco's valuation of its new shares at 775p as part of its valuation of the total package at 1412.5p is misleading because the basis for that valuation is not apparent in any of Minorco's promotional documents but instead is buried in the fine print of its Offer Document. A key promotional document entitled "Minorco New Offer for Consolidated Gold Fields PLC" (Kaplan Dec. sworn to on March 29, 1989, Exh. 3) footnotes the valuation of the offer with the legend that "[t]he bases on which the financial effects of acceptance have been calculated are set out on page 5 of the Offer Document." *Id.* at 2, 4. Page 5 of the Offer Document contains a section denominated "Financial Effects of Acceptance" wherein the value of one new Minorco share is provided along with a footnote which states that the value was arrived at by using a February 22 stock market quotation for Minorco shares. (Kaplan Dec. sworn to on March 29, 1989, Exh. 2 at 5) [10] Plaintiffs fault Minorco for referring to "financial effects of acceptance" rather than "valuation of Minorco shares," although it seems obvious that the value of the shares determines the financial effect of accepting the offer, and thus that the footnotes are not misleading. Again, it is not necessary that corporations treat their investors like children. The information is sufficiently accessible that a reasonable investor could follow the footnotes to the pertinent information, which appears in one

place. Additionally, in the April 10 "Increased and Final Offer" Minorco sent to all shareholders, the valuation is clearly stated on page five, providing another source for shareholders to discover the basis for the valuation. This is not a situation where an investor must collect data from scattered parts of a prospectus to calculate the impact of a proposed transaction on control of the company. *See, e.g., SEC v. Falstaff Brewing Corp.,* 629 F.2d 62, 67 n. 4 (D.C.Cir.), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 569, 66 L.Ed.2d 471 (1980).

The second cluster of alleged omissions also concerns the valuation of Minorco stock. Here, plaintiffs contend that the value of new Minorco stock must fall because North American stockholders must sell within 21 days and a cash-only alternative is not available for other shareholders. However, Minorco has disclosed the basic facts regarding the issuance of 79 million new Minorco shares pursuant to the offer, the cash alternatives available to foreign shareholders and the requirement that shares issued for the benefit of North Americans be sold within 21 days. (Cheyne Dec., Exh. 1 at 3, 9, 15) From that information, an investor may choose to conclude that the price of new Minorco stock will be driven downward by sales after the issuance.

■ Plaintiffs, however, contend essentially that Minorco has a duty to disclose also the amount of stock that might enter the market after issuance. Passing that the number of shares that may enter the market is anyone's guess, and thus that any estimate would be totally speculative and misleading, Gold Fields' charge rests on an assumption that the price of Minorco stock necessarily varies with the number of shares on the market—the more shares available, the lower the price. That assumption is seriously flawed. The market does not value a share of stock the way it values, say, a lithograph, based on how many copies were struck before the plates

10. Similarly, Minorco's offering document for its April 10, "Increased and Final Offer" uses the middle market quotation for Minorco shares for April 7, 1989—750p—in valuing the total package at 1550p.

were destroyed. Stock is valued for its perceived ability to generate income at some point. That perception should not depend on the number of shares offered for sale at any given moment, but on the reason shares are being offered for sale and who is selling. For example, if the sellers are insiders or institutional investors believed to have more information about the company than others, such sales may be treated reasonably as some indication that the market has over-valued the company, and the stock price will drop. A secondary offering may indeed coincide with a long-term or permanent decline in the price, but the decline is "not simply a consequence of the additional supply of stock." R.A. Brealey, *An Introduction to Risk and Return from Common Stocks* 38 (2d Ed.1983). Brealey reports as follows on a survey of such price declines:

> It is clear that the decline was no greater when $100 million of stock was sold than when the figure was $100,000. It could be argued that the size of the offer should have been measured in terms of the proportion of the firm's stock that was involved. The analysis was therefore repeated with this modification. It made no difference: the price decline was no greater when 30 percent of the firm's stock was sold than when the proportion was less than 0.1 percent.

(Brealey at 39 and chart at 41 (Figure 2.9)) Moreover, the short term effect on the price of Minorco stock, if any, from sales following the mergers depends on how much stock is sold, by whom, and how the market otherwise values Minorco's prospects. Thus, Minorco should not be required to detail the amount or exact quantity of stock which might be sold because that is both speculative and largely irrelevant.

In any event, Minorco, in an abundance of caution, has provided shareholders with an explicit warning in its "Increased and Final Offer" issued on April 10, 1989 to the effect that

> Gold Fields shareholders should be aware that this [valuation of the offer based on a pre-offer stock market quotation] does not necessarily reflect the price at which Minorco shares will stand if the Increased Offer becomes wholly unconditional nor, for that matter, the price at which Gold Fields shares will stand if the Increased Offer lapses, since such prices will be determined by market forces.

(Minorco's "Increased and Final Offer" at 5) Plaintiffs have no basis to claim that shareholders are not fully apprised that the valuation of new Minorco shares is speculative.

The third alleged omission, that Minorco has failed to disclose the relative illiquidity of its stock, is frivolous. A table in the Offer Document clearly demonstrates that four companies own some 74% of Minorco's shares. (Cheyne Aff., Exh. 1 at 20) From that information, a reasonable investor could conclude that Minorco's stock is relatively illiquid—and, in turn, that the price of Minorco's stock could be somewhat volatile. It bears repetition that Minorco is not under any obligation to treat Gold Fields' stockholders as children; rather, it is required only to provide basic facts sufficient for them to make their own calculations as to the value of new Minorco stock. By supplying them with a chart showing that nearly three-quarters of Minorco's stock is held by four companies, it has met that burden. Moreover, as the issuance of new shares will obviously increase the liquidity of Minorco's shares, any statement to the effect that Minorco's stock is illiquid would be highly misleading.

The next allegation is that Minorco has overstated its resolve to divest Newmont, GFSA and Renison. Minorco has provided declarations under penalty of perjury by its chairman and chief executive that it intends to honor this commitment. It has backed the promise with the offer of a $100 million bond, and has substantial assets in this country. That other entities or persons in the Anglo group might undermine this commitment does not affect the truthfulness of Minorco's promise. I have no legitimate basis for concluding that Minorco's promise is other than truthful. That I find the hold separate order insuffi-

cient does not compel a finding of a securities violation here. Plaintiffs' attempt to piggyback a securities claim on top of their argument against a hold separate order should be rejected.

■ Plaintiffs cite as evidence of securities fraud statements by Lea and Rohatyn purporting to demonstrate that Minorco has not lined up buyers for the three companies, even though it has been professing to do so for several months. In essence, Gold Fields accuses Minorco of securities fraud for having failed to sell assets it does not and may never own. It is just plain silly to suggest that Minorco—which could not seriously have begun divesting until the Second Circuit had ruled on the propriety of the injunction—somehow had to find a buyer for what at the time was a completely hypothetical transaction. Nor does a statement by a Minorco official in mid-January that the sale of Renison was "absolute rubbish" (Kaplan Dec. sworn to on March 29, 1989, Exh. 14) change the credibility of Minorco's current commitment to do so. Those statements as well as Minorco's past attempts to acquire Newmont came before Minorco's statements in the February tendering documents and are thus largely irrelevant. Finally, plaintiffs' allegation that Minorco induced Gencor to file an affidavit expressing interest in purchasing GFSA by telling Gencor that the commitment need not be definite, even if credited, shows only that the status of these entities is highly uncertain because of this ongoing litigation; few buyers would be willing in such circumstances to make iron-clad agreements. That certainly does not show Minorco's insincerity. In an attempt to cure the antitrust ills described both by this court and the Court of Appeals, Minorco has conceived a plan to divest those subsidiaries. To convert this reasonable albeit inadequate proposal into a securities violation would be fundamentally unfair.

Plaintiffs claim also that Minorco has failed to disclose a substantial risk that the State of Michigan will divest its holdings of Minorco shares, thus depressing the price of Minorco's shares. Plaintiffs claim that the state's divestment laws would require Michigan to divest its Minorco holdings because Minorco does business in South Africa. (Kaplan Dec. sworn to on March 29, 1989, Exh. 9) Plaintiffs report that Michigan State Treasurer Robert Bowman has declared that he "plans to sell off the state's Minorco holdings by the 1994 deadline regardless of any technical interpretation of the law." (Kaplan Dec. sworn to on March 29, 1989, Exh. 8 at 3) This statement is contained in a news article published in the Detroit *Free Press*. Gold Fields hailed this comment as "a significant change in position for Michigan." (Goudiss Aff., Exh. 1) Several days later, however, Bowman stated flatly that Michigan has no current intention to divest its Minorco shares. (Goudiss Aff. at ¶ 4, Exh. 1) In fact, Bowman said that Michigan supports Minorco's takeover bid and that no current legislation requires the state to divest its holdings in Minorco. *Id.* Most damaging to plaintiffs' position, however, is a letter from Bowman to ARC America Corp., a subsidiary of Gold Fields, specifically rejecting any possibility of divestment by the state and noting that "your urging on what actions the retirement systems should take have a hollow ring to them. The transparency of your efforts is matched only by your profligate waste of corporate money in this self-serving advertising campaign." (Goudiss Aff., Exh. 2 at 2) Indeed, Bowman found that Michigan's divestment legislation does not apply:

> [Y]our knowledge of the actual Michigan divestment legislation is either extremely deficient or purposely distorted, as in its current form, it neither applies to Minorco or Chemical Bank. Even if divestment did apply, it should be noted that the legislation allows a five-year phased divestiture so that positions are not dumped on the market causing financial harm to the system.

*Id.* Finally, the letter suggested that Gold Fields consider divesting its own South African companies, from which it derived 17% of its profits in 1987. It is thus apparent that Michigan has not changed its position and, even if it did, such a change would cause no financial harm to Gold Fields

shareholders as future Minorco shareholders. Minorco had more than enough evidence to decide not to include in its offering documents what can only be described as baseless rumor. Finally, any effect of possible future changes in Michigan's laws on divestment is highly contingent and thus need not be disclosed. Indeed, because Gold Fields itself has significant holdings in South Africa, any more restrictive law might apply just as well even if the takeover is thwarted.

In their original complaint, plaintiffs alleged that Minorco did not reveal that Harry Oppenheimer and Anglo companies had extensive holdings in Minorco. In their supplemental complaint, they now admit that Minorco has cured this defect by disclosing in the February offering the holdings in Minorco of Charter Consolidated PLC, the Oppenheimer family, New Central Witwatersrand Areas Ltd. and Metal Co. Ltd. Plaintiffs have now limited their attack to Minorco's failure to disclose that an Oppenheimer family company has sent secret payments to Minorco's chairman, Julian Ogilvie Thompson. Plaintiffs allege that these secret payments create a potential conflict of interest about which a reasonable investor would want to know before deciding whether to tender and thus become a Minorco shareholder. *See Kas v. Financial Gen. Bankshares, Inc.,* 796 F.2d 508, 513–15 (D.C.Cir.1986); *Falstaff Brewing Corp.,* 629 F.2d at 73–76.

In the first round of this litigation, Gold Fields' chairman Rudolph I.J. Agnew asserted that Thompson had disclosed such payments to him. (Agnew Dec. at ¶¶ 3–9) Indeed, the British Monopolies and Mergers Commission, in its February 1989 report on the takeover, found that "some directors of [Anglo American and De Beers] and of Minorco are in part remunerated by a private Oppenheimer family company." (Kaplan Dec. sworn to on March 29, 1989, Exh. 6 at ¶ 7.17) In his affidavit, Thompson did not directly deny this charge, but rather asserted that he has never breached his fiduciary obligations to Minorco shareholders. (Joint Appendix at 1155–66)

Minorco contends that this claim is basically one for breach of fiduciary duty and, citing *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 477, 97 S.Ct. 1292, 1303, 51 L.Ed.2d 480 (1977), argues that §§ 10(b) and 14(e) do not apply to non-disclosures of breaches of fiduciary duty. I need not reach this issue because, even if there was a violation, Minorco has cured it. In papers sent to Gold Fields shareholders describing the April 10, 1989 "Increased and Final Offer," Minorco disclosed the following:

> Except as stated in the remainder of this paragraph, none of the Executive Directors of Minorco receives any remuneration from Anglo American Corporation of South Africa Limited or De Beers Consolidated Mines Limited or any of their associated companies (other than Minorco or subsidiaries of Minorco) or from any of the Oppenheimer family interests. H.R. Slack is a member of the Oppenheimer family and receives a salary from one of the Oppenheimer family companies. J. Ogilvie Thompson, the non-executive Chairman of Minorco, also receives a salary from one of the Oppenheimer family companies, which salary is reimbursed in full by his principal employer, Anglo American Corporation of South Africa Limited, of which he is Deputy Chairman.

(Minorco's "Increased and Final Offer" at 23–24) This disclosure more than fully addresses plaintiffs' concern that shareholders be informed about payments made to Minorco directors by the Oppenheimer companies. Whether other Minorco directors received payments or what happened in the past is thus largely beside the point: the potential conflict of interest—namely, that Minorco directors have received payments from Oppenheimer companies and thus might be beholden to Oppenheimer's interests or controlled by him—has been disclosed.

Plaintiffs' response to Minorco's April 10 disclosures regarding the highly speculative valuation of new Minorco shares, and payments to Minorco's directors, is that shareholders do not have sufficient time to

consider them, and that the disclosures are not sufficiently emphasized. Although ideally shareholders should have 21 days, these relatively simple disclosures can be fully digested in a few minutes; 16 days is more than sufficient time. Moreover, the disclosures appear as part of an "Increased and Final Offer" likely to be perused carefully to evaluate the extent to which it differs from the lesser and penultimate offer.

In sum, then, plaintiffs have failed to show a likelihood of success as to any of the alleged securities violations. Nor have plaintiffs shown sufficiently serious questions going to the merits and a balancing of hardships tipping decidedly in their favor. To the contrary, plaintiffs' securities claims are trifling. The balance of hardships hardly tips decidedly in plaintiffs' favor because corrective disclosure and a 21–day period for shareholders to rescind their tender might jeopardize Minorco's chances to close its tender offer by April 26. Under British law, if Minorco failed to gather 50% of Gold Fields' shares at that time, it would be barred from renewing its tender offer for one year.

Apparently aware that their claims look feeble and contrived, plaintiffs fall back on the argument that discovery in aid of a hearing is necessary in order to find out whether or not these alleged omissions are material pursuant to *Fengler v. Numismatic Americana, Inc.*, 832 F.2d 745, 747–48 (2d Cir.1987). I reject plaintiffs' argument for several reasons. First, plaintiffs have not demonstrated that there is any evidence to be found which this court has not seen. On the contrary, plaintiffs have carpet bombed the landscape with affidavits and other material from day one of this litigation. Nor have plaintiffs hesitated to submit material even in direct contravention of scheduling orders when they believed it was in their interest to do so. Twice plaintiffs have filed legal briefs, affidavits, and other documentation in the form of sur-reply material without requesting leave.

Moreover, this court, for the second time in slightly more than six months, has been forced to decide motions in a matter of days, largely because of plaintiffs' conduct. In October, plaintiffs waited until the tender offer was well under way to seek a preliminary injunction. Now, they have opposed Minorco's request to British officials to extend the tender offer beyond April 26, again forcing this court to decide this matter on an expedited basis in order to accord Minorco fundamental fairness. With such time limits, laborious discovery and extensive hearings would only serve to moot the relief Minorco seeks, and appear to have been requested with that result in mind.

Additionally, plaintiffs have made no showing that discovery is necessary regarding any factual matter in dispute. To the contrary, the strength of their securities claims can be analyzed by perusing the offering documents. As for the allegation that Minorco's promise to sell the three holdings is unbelievable, plaintiffs must provide some evidence to support their theory of a securities violation in order to conduct discovery, the purpose of discovery being to explore factual allegations underlying a claim, not to try to "conjure up a claim that does not exist." *Avnet Inc. v. American Motorists Ins. Co.*, 115 F.R.D. 588, 592 (S.D.N.Y.1987) (Weinfeld, J.); *American Communications Ass'n Local 10, I.B.T. v. Retirement Plan for Employees of RCA Corp. & Subsidiary Co.'s*, 488 F.Supp. 479, 484 (S.D.N.Y.), *aff'd*, 646 F.2d 559 (2d Cir.1980). Considering that the only occasion for an adversary hearing is when there is a basis to be adverse, as opposed to simply an urge to emote, there is also no need for a hearing. This claim that Minorco does not mean what it says is no more than an attempt to piggyback a securities violation onto an antitrust claim, and is absolutely meritless. Moreover, the allegations of secret payments have been cured by Minorco's April 10 statements to Gold Fields' shareholders, so there is nothing relevant left to discover about that matter. In total, plaintiffs' plea for more discovery and a hearing, coupled with its objection to any attempt by Minorco to extend the period of its tender offer under British law, should be called what it is: a device to delay disposition of this matter

past Minorco's deadline to close its tender offer, at which point, under British law, Minorco would be forbidden to renew its offer for more than a year.[11]

As I find that plaintiffs have failed to meet their burden on the alleged securities violations, I need not reach Minorco's argument that American shareholders will not be harmed by most of these omissions because they will never actually own new Minorco shares, nor need I confront the comity concerns cited by the Court of Appeals because there is no need to consider corrective disclosure or any other remedy.

### IV. Conclusion

Minorco's motion to modify the preliminary injunction is denied. Plaintiffs' motion to extend the injunction to compel disclosure of alleged omissions and to correct misstatements is also denied.

SO ORDERED.

### ON MOTION FOR REARGUMENT

Defendant Minorco now moves for reargument of this court's denial of its motion to modify the preliminary injunction halting its proposed takeover of Consolidated Gold Fields. ("Gold Fields") In its April 17, 1989 opinion, familiarity with which is assumed,[1] this court found inadequate Minorco's proposal to hold separate Gold Fields' minority stock interests in Gold Fields of South Africa ("GFSA"), Newmont Mining Corp. ("Newmont") and Renison Goldfields Ltd. ("Renison") for a year pending divestiture. Minorco now suggests added provisions it believes will cure the enforceability and detection problems detailed in the decision, as follows: Co-defendants Anglo American and De Beers, both of which have defaulted in this action, are now willing to post $100 million bonds and

appear for the limited purpose of abiding by the hold separate order. Minorco, which will have assets in the United States of approximately $1.2 billion if the takeover is allowed to proceed and which has already promised to post a $100 million bond, now has volunteered to be liable for any violations by its co-defendants. Minorco, Anglo and De Beers would be forbidden for a ten-year period from acquiring any Newmont, Renison or GFSA assets or shares, whether owned previously by Gold Fields or not. Finally, Anglo, De Beers and Minorco would consent to periodic audits conducted by a special master appointed to police the hold separate order.

The only proper ground for Minorco's motion for reargument or reconsideration is that the court has "overlooked" matters or controlling decisions which, had they been considered, might reasonably have altered the result reached by the court. *Adams v. United States*, 686 F.Supp. 417, 418 (S.D.N.Y.1988); *Bozsi Limited Partnership v. Lynott*, 676 F.Supp. 505, 509 (S.D.N.Y.1987). This strict standard is designed to dissuade litigants from advancing repetitive arguments on issues that have already been fully considered by the court. *Ruiz v. Commissioner of D.O.T. of the City of New York*, 687 F.Supp. 888, 890 (S.D.N.Y.), *aff'd*, 858 F.2d 898 (1988); *Samuel M. Feinberg Testamentary Trust v. Carter*, 664 F.Supp. 140, 142 (S.D.N.Y.1987); *Caleb & Co. v. E.I. DuPont de Nemours & Co.*, 624 F.Supp. 747, 748 (S.D.N.Y.1985). It is thus improper to present new material—such as a revamped hold separate order—because by definition material that has not been previously presented cannot have been previously "overlooked" by the court. *United States v. International Business Ma-*

---

11. I find unconvincing plaintiffs' argument that Minorco could have delayed its February tender offer for several more weeks and thus must pay for miscalculating the date the Court of Appeals would issue its decision. First, the timing of a tender offer is based on far more than speculation on the date a court will render a decision. Minorco had the right to decide when to make its tender offer. Second, if this court allowed the tender offer to lapse without deciding this

question, Minorco would not be the only one to pay—Gold Fields' shareholders, the investing public, numerous financial institutions and other concerns would all pay this price.

1. The reader is also directed to this court's October 24, 1988 (698 F.Supp. 487) and March 24, 1989 (713 F.Supp. 1455) opinions, as well as the Second Circuit's March 22, 1989 opinion (871 F.2d 252).

*chines Corp.,* 79 F.R.D. 412, 414 (S.D.N.Y. 1978).

In reality, Minorco has moved once again to modify the existing injunction. After the Second Circuit affirmed this court's preliminary injunction, I gave Minorco a chance to present its hold separate order because I believed it had not had a full opportunity to litigate the issue. Specifically, Minorco's last-minute reference to divesting Newmont in the first round of litigation in October did not afford Minorco a full and fair chance to litigate the propriety of a hold separate order. And, as I explained in my March 24 opinion, 713 F.Supp. at page 1456, I believe the Second Circuit also did not reach the issue. I therefore afforded Minorco a full opportunity to brief the issue. In doing so, Minorco altered its proposed modification several times in response to Gold Fields' arguments and this court's remarks at the March 24 hearing. After fully considering the issue, I found a hold separate order inappropriate in this case. Because nothing has been offered now that could not have been offered before, Minorco's motion must be denied as an attempt to relitigate an issue fully considered. *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1207 (2d Cir.1970); *American Optical Co. v. Rayex Corp.,* 394 F.2d 155 (2d Cir.) (*per curiam*), *cert. denied,* 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106 (1968). To the extent Minorco argues to the contrary, it seeks a rule that would make the scope of a court's preliminary relief the subject of perpetual litigation by any party to change this or that aspect of the outcome. The "issue" here, as I believe that concept was intended in *Semmes Motors,* is the efficacy of a hold separate order. That issue has been decided.

In any event, Minorco's new proposal is inadequate. Although it addresses some of the enforcement concerns this court had, namely the possible anti-competitive activities of Minorco's co-defendants and the post-divestiture future of the three companies, it still does not ensure full enforceability because members of the Anglo group other than Anglo, De Beers and Renison remain free to purchase shares in the three companies. As I explained in my April 17 opinion, "nothing can stop Anglo and De Beers … *as well as other group members,* from conspiring to undermine the hold separate order and eventually purchasing shares in the three companies." At 1468 (emphasis added). Furthermore, given that the Anglo group and the three companies are direct competitors in the non-communist world gold market, the Anglo group will have every incentive to purchase shares. Minorco has argued that market purchases are not the concern of this court in this case. That is not entirely true. Although such possible purchases are not the underlying conduct complained of in this case, that is different from saying that the possibility and effect of such purchases should not be considered when determining the efficacy of a hold separate order that poses the difficulties of detection and enforcement discussed elsewhere in this and past opinions. I believe that the possibility of such purchases is a relevant consideration.

Minorco has also suggested that it is being prejudiced by its own willingness to divest its interests in GFSA, Newmont and Renison rather than merely to hold them separate, and that there would be fewer objections if it held these companies without divesting them. Here, Minorco overlooks the potential for anti-competitive harm that would exist during any period when the Anglo group held substantial interests in the three companies. That potential has already been pointed out. As I said earlier, "the proposed hold separate order would not effectively check interim anti-competitive harm, largely because of the possibility that an Anglo group affiliate not subject to this court's jurisdiction could purchase shares in the companies and suppress their competitive conduct." At 1467. Those comments hold true for this proposal as well.

Lest Minorco attempt to cure this problem by suggesting, for example, that Harry Oppenheimer consent to this court's jurisdiction or that defendants increase the bond amount, I should explain why insurmountable detection problems would doom any proposal. Because Gold Fields will no

longer exist once this hold separate order takes effect, there will be no real adversary to challenge actions by Minorco, Anglo and De Beers. Nor is the government involved here. In such circumstances, a special master, even one supported by a battalion of auditors and investigators, can never be a complete replacement. No truly self-interested entity remains to sound an alarm about anti-competitive activity or to question whether the special master is doing his job properly. Although Newmont, GFSA and Renison will have standing here, "there is no assurance they could detect a gradual accumulation of shares, or that standing would assure the will to act." At 1467. Minorco reasons that an undetected accumulation of shares does the acquiror no good until that acquiror surfaces to use its influence on the target, at which point the target may be relied on to sound the tocsin. Bypassing that an acquiror could accomplish anti-competitive results without necessarily revealing its true face, for example, through informal and discreet approaches, the target's hypothetical response at that point, perhaps years from now, is just that—hypothetical. The standard here is whether a hold separate order *would* be as effective in curbing the conduct at issue, not whether it *might* be. Although Minorco notes elsewhere that GFSA and Renison have not objected here to the proposed acquisition or the hold separate order, and asks me to infer from that silence their belief that no anti-competitive harm will result, it is equally reasonable to infer from their silence that those companies, both based in South Africa, prefer not to take on the Anglo group in a public forum. It is difficult to conclude that their supposed natural eagerness to resist the Anglo group in the future should be taken to guarantee as reliably against anti-competitive harm as a full stop injunction. Even if one can accept *arguendo* Newmont's interest in resisting a takeover as a constant because the 49.3% of its shares owned by Gold Fields would be sold to an entity apparently independent of defendants, the potential resistance of Newmont alone among the three Gold Fields subsidiaries is simply not as effective as a preliminary injunction.

The one reliable constant here is the interest and incentive of the Anglo group to control its direct competitors. Indeed, that may be why even the commentator cited by Minorco in support of the availability of a hold separate remedy concludes that such a remedy is inappropriate in a horizontal merger case. Note, *Hold Separate Orders in Government Antimerger Suits*, 70 Geo. L.J. 1337, 1357–58 (1982).

Even assuming that all three companies are motivated to protest, there is no assurance that the special master's auditors will be able to find out whether Anglo and De Beers or other members of the Anglo group are purchasing shares, or whether shares are being purchased by an entity not formally affiliated with the Anglo group, but nonetheless acting in its interest. I have already indicated in my April 17 opinion that many foreign jurisdictions—including South Africa—have secrecy statutes which make a determination of the true state of compliance impossible, particularly when there is no way to confer effect subpoena power upon the special master. Minorco's proposed order might create additional barriers for the Anglo group, but not an enforcement mechanism to assure that those barriers could not be overcome. Furthermore, Anglo and De Beers could not voluntarily provide information to the auditor without violating South African law, absent consent of the South African Minister of Economic Affairs. (Kaplan Dec. Exh. A ¶¶ 4.1, 4.3) Minorco's response is that there "is no reason to believe that the Minister would refuse such consent if requested to grant it by Anglo and/or de Beers." (Simon Aff. ¶ 8) The South African Minister, however, may wish to deny or limit the request for any number of reasons. Such open contingencies cannot provide the foundation for a hold separate order that would match the reliability of a preliminary injunction. And, as I have stated earlier, other Anglo group members remain free to do as they please.

Minorco's motion is denied. As agreed in open court, Minorco is deemed to have requested a stay of this order, and that stay is denied for the reasons stated in open court on April 18, 1989, at pages 6–7 of the transcript of that day's proceedings.

SO ORDERED.